[No. S007210. Feb. 19, 1998.]

THE PEOPLE, Plaintiff and Respondent, v.
WILLIAM MICHAEL DENNIS, Defendant and Appellant.

478

488

## COUNSEL

Andrew Parnes and E. Evans Young, under appointments by the Supreme Court, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Ronald A. Bass, Assistant Attorney General,

Ronald S. Matthias and Martin S. Kaye, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**CHIN, J.**—A jury found William Michael Dennis guilty of first degree murder for killing his former wife, Doreen Erbert. (Pen. Code, §§ 187, 189.)[1] When defendant attacked Doreen with a machete-like weapon, she was eight months pregnant. The jury found defendant guilty of second degree murder for killing Doreen's fetus. (§§ 187, 189.) The jury also found as a special circumstance that defendant committed multiple murders. (§ 190.2, subd. (a)(3).)

At the conclusion of the penalty phase, the jury returned a verdict of death. The trial court denied defendant's motion to modify the verdict under section 190.4, subdivision (e), and sentenced him to death for Doreen Erbert's murder. This appeal is automatic. (§ 1239, subd. (b).)

## I. FACTS

### A. *Summary of Facts*

On Halloween night, October 31, 1984, defendant went in disguise to the home where his former wife, Doreen Erbert, lived with her husband of five years, Charles Erbert, and their four-year-old daughter, Deanna. While Charles was away from the house, defendant attacked Doreen with a machete or similar weapon after she opened the door to him. Doreen was eight months pregnant. Among the many wounds she suffered were severe cuts to her abdomen, uterus, placenta, and the umbilical cord. The fetus suffered severe chopping wounds and was expelled from Doreen's womb. The fetus was found dead at the scene; Doreen died in the ambulance on the way to the hospital. When police questioned defendant later that night, he denied killing Doreen. At trial, however, defendant did not contest his identity as the killer.

Defendant's counsel argued the killings resulted from mental illness and were not premeditated or deliberated. Defendant presented psychiatric testimony that he became delusional after his four-year-old son, Paul, drowned in Doreen's pool four years earlier. The psychiatrist asserted that defendant came to believe Doreen had wanted their son to die. In the psychiatrist's opinion, defendant fixated on blaming Doreen for Paul's death and fantasized about killing Doreen and Charles Erbert. The defense also said defendant's recent reassignment to a less prestigious, lower paying job contributed to his depressed and irrational state.

[1]All further statutory references are to the Penal Code, except as otherwise noted.

The prosecution's penalty phase presentation relied almost entirely on the evidence of the crimes presented at the guilt phase. The defense presented friends and associates of defendant to testify to his good character, his childhood difficulties, and his love for his son Paul. Defendant did not testify during either the guilt or penalty phases.

### B. *The Prosecution Case*

Charles Erbert and Doreen met after Doreen's divorce from defendant; Doreen and Charles married in 1979. After the marriage, Doreen moved into the house Charles had purchased eight years earlier. At the time, Doreen had a three-year-old son, Paul, by her marriage to defendant. On November 26, 1979, Doreen gave birth to Deanna Erbert. Paul continued to live with Doreen, Charles, and Deanna. Defendant came to the house to pick up Paul for visits. Defendant lived within six blocks of the Erberts, about a six-minute walk.

In 1980, while Doreen was home with Paul, he died in a drowning accident in the family's backyard swimming pool. The following year, defendant sued Doreen and Charles for personal injuries and wrongful death for Paul's drowning. The case proceeded to trial. The jury's verdict was for the Erberts; the court entered judgment against defendant's claims in March 1982. In the courtroom after the trial, Charles asked defendant not to come to their house any more. Charles did not speak to defendant again and only saw him once, in public at a shopping center.

Defendant was bitter about the divorce from Doreen, and his bitterness continued after his son's death. He was upset and dissatisfied by the outcome of his wrongful death suit. He blamed Doreen for Paul's death and believed she had not suffered enough for the drowning. He told a coworker that he believed Doreen killed Paul, that she had not been watching him and did not dive in to rescue him after she found him at the bottom of the pool. It appeared to another of defendant's coworkers at Lockheed that Paul's death severed the last tie by which defendant maintained contact with Doreen.

Around the first of October 1984, defendant lost his position at Lockheed as a sprayer in the manufacture of tiles used on the space shuttles. To avoid being laid off, defendant accepted a job reduction to work in Lockheed's document reproduction unit. The change meant that defendant's pay would be reduced in stages from $13.53 per hour to $10.99 per hour. Although defendant acted congenially toward other workers in the new unit, he was not happy there and commented sarcastically about the unit's work to his former supervisor.

On Halloween night, October 31, 1984, Charles Erbert took Deanna trick-or-treating after he arrived home from work. Doreen remained at home. She was eight months into her term and was visibly pregnant. Doreen's sister saw her the previous weekend at a family breakfast. Two photographs from that affair were introduced to show Doreen's physical appearance the week before she died. Her sister said she had teased Doreen, who was under five feet tall, that "she was as far out as she was high."

Charles returned home with Deanna. He had saved a few houses for Doreen to take Deanna to visit while he handed out candy at home. When Deanna and Doreen returned, Charles left for the liquor store in one of his two trucks. Before leaving, he suggested to Doreen it was getting late and she should close up the house for the evening. Charles estimated he was away from the house for about 15 minutes.

When he returned, he noticed the front door was unlocked. When he opened the door, he saw Doreen lying bleeding on the floor at the entry to the living room. He saw the fetus in the living room and thought at first Doreen had miscarried. Then he saw Doreen's hand lying in the living room along with part of the fetus. He tried to stop Doreen's bleeding by holding her arm tightly, but he saw there were severe cuts on her neck and stomach as well.

While going to the telephone, Charles slipped and fell in the blood, adding to the substantial amount he already had on himself. Unable to get through to 911, Charles called the fire department and a neighbor for help. He noticed Deanna hiding in the living room and took her into the kitchen so that she could not see more. He continued to try to stop Doreen's bleeding as he waited for help. Charles said that Deanna told him she "heard the baby crying." She also told him, and later said to the neighbor, Jennie Chapman, that the man who killed Doreen had threatened to kill her if she told anyone. Charles said too that he first recalled at trial that Deanna said Doreen had called out "Michael."

When the paramedics arrived, Charles tried to assist them with Doreen. After his neighbor came to the house, he took Deanna out to sit with the neighbor in her car. He saw the paramedics putting Doreen in the ambulance. When he tried to go with his wife despite the paramedics' requests, the police arrested him after noticing he was bloody and had alcohol on his breath. They left him handcuffed in the patrol car for the next hour, enraged and kicking at the car's windows.

Deanna testified at trial. She was four years old when her mother was killed and eight years old at the time of trial. She did not remember much

about the traumatic attack on her mother. Deanna recalled going to answer the door with her mother, and that, when Doreen opened the door, she said to the man there, " 'Get out of my house.' " Deanna testified the man said, " 'I'm going to kill you.' " Doreen told Deanna to get behind the couch, and she ran and hid there. She could not see what was happening, but she heard both her mother's voice and the man's. She left her hiding place twice, once to peek from the kitchen and once to get her blanket. She came out again after she knew the man had left. She saw all the blood and went back behind the couch, where she waited until her father returned. She could not remember what she saw when she peeked from the kitchen.

Reserve San Jose Police Officer Glen Sutfin responded to a 9:15 p.m. fire department dispatch and arrived on the scene after the paramedics and fire department personnel. He and other police officers on the scene then searched the house because of the possibility the perpetrator was still there. About the same time, paramedics were putting Doreen, who was still alive, into the ambulance for transport to a hospital. Doreen's severed hand lay in a pool of blood near her fetus. The fetus's left leg had been severed; a paramedic determined he could not be resuscitated. Doreen was pronounced dead when the ambulance reached the hospital.

The scene of the killings was extremely bloody. Many people had tracked in and out of the house as the paramedics, firefighters, and police came and went.[2] An expert on blood spatter interpretation testified that many of the bloodstains in the entryway and on a stool, jack-o'-lantern, the front door, and the ceiling, were velocity stains. The blood on the ceiling and upper walls probably flew off the weapon as it was raised after striking Doreen. There were slash marks on the front door and in the eight-foot-high ceiling above the entryway. A wolf mask was in a corner of the front porch area. The mask was not from the Erbert household.

At 12:23 a.m., Sergeant James Morin and four other San Jose police officers arrived at defendant's house. A uniformed officer rang the doorbell. Although there was a light on in defendant's bedroom, no one responded to the repeated ringing of the doorbell. The police had county communications telephone the house to inform defendant the police were present and to ask him to answer the door. After defendant answered the telephone, the bedroom light was turned off as a hall light was turned on; one officer heard the sound of running water in the house for a few minutes. When defendant answered the door, he did not look as if he had been asleep.

Sergeant Morin explained to defendant that his ex-wife had been attacked recently and that they wanted to know if he had any information that might

---

[2]Two people who arrived around this time saw the body of the fetus lying in a slightly different part of the entry area than where Charles Erbert first saw the fetus.

shed some light on the incident. Sergeant Morin asked if they could enter to speak with him; defendant invited them inside. Once inside, and after defendant was seated at his kitchen table, Sergeant Morin told him that Doreen had been murdered. Defendant replied with a straightforward, "You're kidding." Sergeant Morin noticed that the fingers of defendant's right hand were severely cut and still bleeding enough to saturate the gauze bandages wrapped around each finger.[3]

When asked for identification, defendant went upstairs to his bedroom with one officer. The bed did not appear as though anyone had slept in it. The officer noticed that, while defendant was looking for his identification, he also kept glancing over at the bed's headboard. Another officer later retrieved a loaded revolver from the floor behind the headboard.

Defendant consented to a police search of his residence. In the garage Sergeant Morin found blood drops in front of the washer and dryer and a trail of blood that led outside. There were blood drops in the kitchen, a pair of bloodstained jeans on defendant's bed, blood on a set of keys in defendant's bedroom, and bloody bandaging in the bathroom garbage. Sergeant Morin arrested defendant and had the house secured. The police found defendant's mother asleep in her separate apartment at the rear of the house.

Later, about 1:45 a.m., police found another trail of blood drops that seemed to start about 100 yards west of defendant's house and proceed to his driveway. The trail of blood appeared to continue alongside defendant's garage and end in front of the washer and dryer. Police found a small ball of bloodstained fibers adhering to the otherwise empty garbage can next to defendant's garage. They found the same type of fibers in defendant's mother's apartment. The hood of the truck parked in defendant's driveway was warm, but not hot, at 2:00 or 2:15 a.m. The truck was dusty, but the driver's door and window appeared to have been wiped recently. There was blood on the ignition switch, on the radio switch, on a piece of rope in the truck, on the seat back rest, and on the steering column. A spot of blood was found on the seat and another on the rubber mat under the gas pedal.

A week later, in a search under a warrant, police found in defendant's bedroom closet the adhesive label for a Stanley 18-inch machete. No machete was found in defendant's house. Receipts found in the house led police to the Milpitas Builder's Emporium, a local hardware store. There they

---

[3]Dr. John Nelligan treated defendant for the cuts. The cuts were painful and deep, severing nerves, tendons, and the volar plate. The injuries were sharp slicing wounds that required a sharp blade and a fair amount of force to cut through tendons. These injuries can occur if, while a person is grasping a bladed weapon, his forward stabbing thrust is stopped, and his hand slides forward onto the blade edge.

purchased a Stanley machete that bore a label identical to the one found in defendant's closet. The machete was introduced in evidence.

The wolf mask found on the Erberts' porch was identified as one that defendant wore to a Halloween party one year before the attack on Doreen. A picture of defendant wearing the wolf mask and matching rubber hands was admitted into evidence. None of the searches of defendant's home produced a rubber wolf mask or matching rubber hands.[4] This wolf mask was generally described as portraying a "cartoonish" wolf with its tongue hanging out and with bulging eyes.

The night that defendant was arrested, he waived his rights and agreed to a taped interview with the police about 2:30 a.m. During the interview, defendant denied killing Doreen. He said that he had been home since finishing work about 4:00 p.m. He briefly walked outside in front of the house a few times because so few children had stopped by for candy. When asked about his Halloween costumes, defendant described several he had worn to parties, but failed to mention the wolf mask he wore to the previous year's party. He explained his cut hand by claiming he had carelessly tossed a kitchen knife into the air and accidentally grabbed it by the blade. He did not remember if he went to the garage after cutting himself. Defendant denied walking to Doreen's home or being on the nearby overpass that night.

Defendant's mother testified that she and defendant had dinner that night about 6:00 or 6:30 and that she returned to her separate apartment around 8:15 p.m. Before dinner, she and defendant were not together. Defendant's next-door neighbor testified defendant gave her some misdelivered mail around 6:30 p.m. and told her he was going to a Halloween party.

Don Isbell, a neighbor of the Erberts, testified that he and two of his children went trick-or-treating in the neighborhood. They stopped at the Erberts' home earlier in the evening, before going to a 7:00 p.m. party at his son's school. He said Doreen obviously was pregnant. As he left, Isbell noticed a man wearing a wolf mask resembling defendant's. The man was standing in the street and looking towards the Erberts' home. Isbell's son also noticed the man in the wolf mask. Between 6:30 and 7:00 p.m., another neighbor, Manuel Gonzalez, saw a man he later recognized as defendant

---

[4]Because defendant ultimately conceded the issue of identity at trial, we only summarize the conclusions of blood typing and hair sample matching testimony. Serological testing of the numerous blood samples was consistent with defendant being the murderer. Hair found on the machete label was consistent with defendant's hair. Hair found on the wolf mask was consistent with Doreen's hair. Some scalp hair on the small ball of bloodstained fibers from the garbage can outside defendant's garage was consistent only with Doreen's hair as well.

standing across the street from the Erberts and looking at the house next door to theirs.[5]

Another adult who was escorting children that night said she saw a man wearing "mechanics-type" coveralls, not bib overalls, and a "goofy" wolf mask about 8:55 p.m. The man was walking down the street on which defendant lived, heading towards the pedestrian overpass that connected defendant's neighborhood to Doreen's. The man held a large grocery bag at his side. The bag appeared to contain a heavy object. One of defendant's neighbors, then 10 years old, saw a man in a wolf mask walking down the street toward the pedestrian overpass at 8:30 or 9:00 p.m.

Dr. John Hauser testified to the results of the autopsies he performed on Doreen and the fetus on November 1. Doreen died from multiple chopping wounds that resulted in exsanguination. The wounds probably were inflicted with a heavy, sharp, sword-like instrument that was able to cut cleanly through soft tissues and into bone. A blade like the one on the Stanley 18-inch machete could inflict such injuries.

Doreen suffered many cuts on the left and right sides and back of her head. Some cuts penetrated the skull. She had numerous deep wounds on the right side of her head, some of which fractured the skull; one penetrated two inches into the brain.

Doreen's left hand was completely severed just above the wrist. She had wounds on the upper back portion of her left shoulder, including a gaping cut down to the bone. She also received severe cuts to the right shoulder, some of which cut into the scapula and one of which severed the head of the humerus. Her right breast received three cuts, including one that was consistent with a stabbing injury.

On Doreen's thighs and legs there were long, deep, gaping wounds consistent with chopping. A heavy blow caused a large, gaping cut to her right thigh and penetrated to the bone, fracturing the femur.

Doreen had a nine-inch gaping wound in her abdomen and another five-and-one-half-inch chopping wound parallel to that. She had suffered multiple cuts through the abdomen while the fetus was still inside her. Her

[5]Another neighbor, Frank Gomez, was trick-or-treating with his children that night while wearing bib overalls and a wolf mask different from the one associated with defendant. Gomez's mask was described as portraying a scary wolf, in contrast to defendant's "cartoonish" wolf mask. He went out with his children about 7:30 p.m. and returned home by 8:30 or 8:45 p.m. He did not stop at the Erberts' home. Several people said they saw a man wearing a mask like Gomez's in the area.

stomach and large bowel were cut open. There were three cuts to her uterine wall, including an eight-inch cut that extended through it. Her placenta was cut, and there were four cuts to the umbilical cord, including one that severed it near the place where it had been attached to the fetus.

The fetus was separated from Doreen after her abdominal wounds allowed his expulsion. The fetus was one month short of full term and could have survived if born prematurely. A cut to his head penetrated into the bone. His left shoulder blade was cut through, although his arm was not, indicating that it was up and out of the way. The fetus's scrotum, penis, perineum, and back of the right thigh were cut. His left leg was severed below the knee. A large, five-inch wound cut through half of his body. This wound extended from his upper right abdomen through his left chest to his left armpit, cutting through the shoulder blade, the second thoracic vertebra, the liver, and one lung, and transecting the heart. This wound stopped his heart and circulation. Examination of his lungs demonstrated they had never been expanded, and there was no air in them. The fetus never breathed or lived independently of Doreen. The injuries to Doreen and her fetus prevented the fetus from ever breathing.

## C. *The Defense Case*

Defendant presented evidence that Paul's drowning death adversely affected his job performance, which previously had been very good. Friends testified that defendant, who had a hearing impediment, was a compassionate and good-natured person who had been proud of his son. One friend testified that defendant was a quiet person who was devastated by his son's death and became even more withdrawn as a result. This friend said defendant's despair over his son seemed almost abnormal, and that defendant appeared despondent before Halloween. Dan Reed, who rented a room in defendant's house starting in August 1984, said defendant did not appear to be obsessive about Paul and did not show animosity toward Doreen.

A neighbor of the Erberts testified to the circumstances of Paul's drowning and Doreen's efforts to rescue Paul from the pool. He testified that Doreen was very shaken by the drowning. Defendant's attorney in the wrongful death action said he believed the suit was motivated by defendant's desire to have Doreen accept responsibility for Paul's death. He said that defendant was upset with the verdict, and in an emotional scene soon afterwards, defendant wailed and said, " 'She got away with it.' "

Psychiatrist Samuel Benson interviewed defendant five times during April and May of 1986. The last interview was a videotaped, four-hour session

conducted while defendant was heavily sedated with sodium amytal, a drug that reduces inhibitions and can help people discuss matters they have repressed. Dr. Benson based his eventual diagnosis of defendant on the five interviews, medical reports, the public defender's investigator's notes, a psychosocial history done by a sentencing resource specialist, a psychological report done by a Dr. Stevenson, and various persons' reports of defendant's life history.

Dr. Benson recounted a great deal of the information he had received from and about defendant. He noted that defendant suffered from hearing loss as a youth, which caused him to stutter and to stare at others in order to read their lips. Defendant's parents divorced when he was nine years old. Defendant developed an eating disorder and gained a lot of weight, a problem he would continue to have throughout his life. By about the age of 19 or 20, defendant was depressed and unable to "get any girlfriends." He made what Dr. Benson believed was a genuine attempt at suicide.

Less than one year after defendant met Doreen, they were married. Problems arose between them; defendant lost his job, and Doreen had affairs. They divorced after Paul was born. Defendant did not contest Doreen's custody of Paul because he believed she would be a good mother. After Doreen's dog drowned in the swimming pool, defendant became concerned about Paul's safety. He demanded that Doreen fence the pool and offered to pay all or part of the cost. Doreen eventually did have a fence installed around the pool. Defendant told Dr. Benson that he had been concerned because Doreen used marijuana while Paul was in her care. He also said he had been very generous to both of them after the divorce.

Defendant told Dr. Benson that Paul was very close to him and sometimes did not want to return to Doreen after visits. Defendant had returned Paul to Doreen earlier on the day he drowned, although he wanted to stay with defendant. Defendant said he had a premonition of Paul's death and initially blamed himself for Paul's death.

However, Dr. Benson testified that defendant came to blame Doreen for Paul's drowning. Defendant thought Doreen should have jumped into the pool herself to save Paul instead of going to the neighbor's house for help. He sued the Erberts against the advice of family and friends. Defendant said he could not see Doreen suffering from Paul's death. He thought he had been the only sad person at the funeral. Defendant came to believe that Doreen had wanted Paul to die, although no one else believed that. Defendant and Doreen argued over the funeral expenses and his last child support payment. He felt Doreen and Charles mistreated him.

Dr. Benson said he believed defendant sued Doreen and Charles to relieve his own guilt over Paul's death. He testified that defendant became more psychotic after losing the suit and held a delusional belief that his attorney would kill him. Dr. Benson believed the therapy defendant received was inadequate.

According to Dr. Benson, defendant eventually started to fantasize about killing Doreen and Charles in retribution for Paul's death. Dr. Benson suggested that, on the night of the killings, defendant was struggling with these fantasies when he became overwhelmed by longing for his son triggered by trick-or-treating children. Defendant decided to do something that night because he thought he could get away with it.

Dr. Benson's opinion was that defendant was suffering from a mental disease and became delusional. Defendant admitted to Dr. Benson that he killed Doreen and the fetus, but he insisted that he did not know Doreen was pregnant.

Dr. Benson believed that defendant became enraged, as shown by his inability to relate more than "spotty" details of the moments before the killings. According to Dr. Benson, this showed defendant's brain was not functioning and recording events properly. Dr. Benson also accepted defendant's assertion that he saw no color during the killings as demonstrating a "medical condition" and that he was enraged.[6] Defendant said that when Doreen answered the door, she turned her back on him. He told her, "You killed my boy." Doreen then recognized his voice and told him to leave. Defendant told Doreen he was going to kill her and began stabbing her. Defendant said he realized Doreen was pregnant only after he saw the amniotic fluid and the fetus on the floor. Defendant told Dr. Benson he would not have hurt Doreen if he had known she was pregnant. Defendant said that he left after seeing Doreen vomiting blood. Defendant denied cutting the fetus. Defendant told Dr. Benson that while he was killing Doreen, he asked her how it felt to drown.

Dr. Benson's opinion was that defendant suffered a major depressive episode over his son's death, and that he had a dependent personality disorder. In Dr. Benson's view, defendant's mental disease or defect at the time of the killings had "a tremendous impact" on his acts.

Defendant also told Dr. Benson of a plan he had to drown Doreen and Charles by placing them in body bags in boxes and dumping them into the

---

[6]Dr. Benson did acknowledge that defendant told him Doreen was wearing a pink nightgown when he attacked her.

sea from his boat. Dr. Benson attributed this plan to fantasy as well, although defendant owned a boat and had in his toolshed two reinforced, lockable boxes that he made, two apparently hand-stitched body bags, and two anchors.

### D. *Penalty Phase*

By stipulation, the trial evidence was deemed included in the penalty phase. The prosecution introduced as additional evidence the materials found in defendant's toolshed, which the prosecutor connected to defendant's plan to drown the Erberts.

Defendant offered evidence from his friends and associates as to his childhood difficulties, his shyness and loneliness due to his hearing problem, his friendly and easygoing nature, his pride and love for his son and his devastation at Paul's death, his honesty, thoughtfulness, and sensitivity, his good record at Lockheed, and his compassion for others. Defendant's mother presented a pictorial biography of defendant's life and their relationship and spoke of awards he won. The jury also heard a tape recording of defendant and his son.

## II. Discussion

### A. *Guilt Phase*

#### 1. *Section 12022.9 Issues*

Defendant raises a series of arguments based on the premise that the court should have instructed the jury on section 12022.9 as an alternative charge to the fetal murder alleged in count 2. That section was enacted in 1985, the year after the killings in this case, and became effective January 1, 1986. At the time of defendant's trial the section read: "Any person who, during the commission or attempted commission of a felony, . . . knows or reasonably should know that the victim is pregnant, with intent to inflict injury, and without the consent of the woman, personally inflicts injury upon a pregnant woman which results in the termination of the pregnancy shall, in addition and consecutive to the punishment prescribed by the felony or attempted felony of which the person has been convicted, be punished by an additional term of five years in the state prison. The additional term provided in this section shall not be imposed unless the fact of such injury is charged in the accusatory pleading and admitted or found to be true by the trier of fact. [¶] Nothing in this section shall be construed as affecting the applicability of subdivision (a) of Section 187 of the Penal Code." (Stats. 1985, ch. 1375, § 1, p. 4881.)

The keystone for defendant's arguments is his contention that section 12022.9 should be considered to be either a lesser included offense or a lesser related offense to fetal murder. If section 12022.9 is viewed as a lesser included offense to fetal murder, defendant believes the trial court had a sua sponte duty to instruct the jury on that section. If it is seen as a lesser related offense, then defendant asserts his counsel was ineffective for failing to request an instruction. In either case, defendant argues he was entitled to have the statute applied retroactively to his acts as an alternative to the fetal homicide charge. In this regard, he also declares he would have waived any ex post facto bar to an instruction on section 12022.9 as an alternative to fetal murder.

The fundamental flaw underlying defendant's contentions is that section 12022.9 defines a sentence enhancement, not a substantive offense. ■ Enhancements, like special circumstances, are not substantive crimes. (*People* v. *Morris* (1988) 46 Cal.3d 1, 16 [249 Cal.Rptr. 119, 756 P.2d 843], disapproved on another point in *In re Sassounian* (1995) 9 Cal.4th 535, 543-545, fns. 5, 6 [37 Cal.Rptr.2d 446, 887 P.2d 527].) California courts have long recognized that an enhancement is not a separate crime or offense. (*People* v. *Wims* (1995) 10 Cal.4th 293, 304 [41 Cal.Rptr.2d 241, 895 P.2d 77].) As we recently stated in *Wims*: "[I]n our statutory scheme sentence enhancements are not 'equivalent' to, nor do they 'function' as, substantive offenses. Most fundamentally, a sentence enhancement is not equivalent to a substantive offense, because a defendant is not at risk for punishment under an enhancement allegation until convicted of a related substantive offense. [Citation.] . . . The Legislature, moreover, has in various ways expressed its intention that enhancements *not* be treated as substantive offenses." (*Id.* at p. 307, fn. omitted, original italics.)

An enhancement is " 'an additional term of imprisonment added to the base term.' " (*People* v. *Hernandez* (1988) 46 Cal.3d 194, 207 [249 Cal.Rptr. 850, 757 P.2d 1013], quoting Cal. Rules of Court, rule 405(c).) ■ Section 12022.9 provides for "an additional term of five years" of imprisonment "in addition and consecutive to the punishment prescribed by the felony or attempted felony of which the person has been convicted . . . ." The explicit description of the term section 12022.9 imposes as being "additional" is consistent with a legislative intent to designate an enhancement. (*People* v. *Hernandez, supra,* 46 Cal.3d at pp. 207-208; cf. *People* v. *Rayford* (1994) 9 Cal.4th 1, 9-10 [36 Cal.Rptr.2d 317, 884 P.2d 1369].)

We also note that section 12022.9 specifies only a single term of imprisonment rather than a range of possible terms. A statute's specification of confinement for one of three possible terms does not necessarily mean it

concerns a separate crime instead of an enhancement. (*People* v. *Rayford*, *supra*, 9 Cal.4th at p. 9; *People* v. *Hall* (1994) 8 Cal.4th 950, 958-959 [35 Cal.Rptr.2d 432, 883 P.2d 974].) Nevertheless, a statute's provision for only one term of additional imprisonment is characteristic of an enhancement. (*People* v. *Hernandez*, *supra*, 46 Cal.3d at pp. 207-208; cf. *People* v. *Rayford*, *supra*, 9 Cal.4th at pp. 9-10.) Here, as in *Hernandez*, the words of the statute and the specification of a single term leave no doubt the Legislature intended section 12022.9 to be an enhancement rather than a substantive crime. (*People* v. *Hernandez*, *supra*, 46 Cal.3d at p. 208.) Indeed, in section 1170.1, the Legislature repeatedly identified section 12022.9 as an enhancement. (See former § 1170.1, subds. (a), (b)(1), (e), (f), (g)(1), (h).)[7]

As an enhancement, section 12022.9 does not represent an alternative to a charge of fetal murder in violation of section 187. Instead, it imposes an additional punishment for committing, or attempting to commit, a felony in a manner that intentionally injures a pregnant woman and results in termination of her pregnancy. The enhancement relates to the particular injury a defendant inflicts on a woman in committing the substantive crime. Imposition of the enhancement neither precludes punishment for, nor constitutes an

---

[7]Defendant attempts to undercut this conclusion by reference to various statements found in materials from section 12022.9's legislative history. He asks that we take judicial notice of seven items from the files of Assembly and Senate committees concerning Assembly Bill No. 1087 (1985-1986 Reg. Sess.), which amended section 1170.1 and added section 12022.9. Those items include three committee reports, two letters from supporters of the bill, and two prior versions of the bill. We decline to grant the request.

With respect to the committee reports, the courts have considered such materials when a statute's meaning was uncertain. (See, e.g., *People* v. *Cruz* (1996) 13 Cal.4th 764, 773-774, fn. 5 [55 Cal.Rptr.2d 117, 919 P.2d 731] and accompanying text.) Here, there is no uncertainty about the meaning of section 12022.9. The Legislature has consistently and explicitly designated section 12022.9 as an enhancement, not a substantive offense or an alternative to a charge of fetal homicide.

With respect to the letters of Assembly Bill No. 1087's supporters, they similarly hold no interpretive value where the statutory language is clear and unambiguous. Moreover, in deciding questions of legislative intent, we consider individual legislators' views only in narrowly prescribed circumstances, none of which is presented here. (See, e.g., *California Teachers Assn.* v. *San Diego Community College Dist.* (1981) 28 Cal.3d 692, 699-701 [170 Cal.Rptr. 817, 621 P.2d 856]; *In re Marriage of Bouquet* (1976) 16 Cal.3d 583, 589-591 [128 Cal.Rptr. 427, 546 P.2d 1371].) The letters defendant asks us to consider are not from legislators who considered and acted on Assembly Bill No. 1087 (1985-1986 Reg. Sess.). Rather, the two letters simply state the views of two groups specially interested in supporting the bill's passage.

We also find nothing we should judicially notice in defendant's proffer of two earlier versions of the legislation eventually enacted by passage of Assembly Bill No. 1087 (1985-1986 Reg. Sess.). Contrary to defendant's view, the Legislature's decision to enact section 12022.9 without distinguishing viable and nonviable fetuses does not suggest it considered the section a substitute for creating the crime of fetal manslaughter.

In any event, even if we took judicial notice of the materials defendant requests, they contain nothing that conflicts with our conclusion that section 12022.9 is only a sentence enhancement, not a substantive offense or an alternative to a charge of fetal homicide.

alternative to conviction of, a separate crime—murder—against a second victim—the fetus. (See *People* v. *Apodaca* (1978) 76 Cal.App.3d 479, 493 [142 Cal.Rptr. 830], disapproved on other grounds in *People* v. *Davis* (1994) 7 Cal.4th 797, 804, 810 [30 Cal.Rptr.2d 50, 872 P.2d 591].)

The Legislature's directive in the final paragraph of former section 12022.9 (now the final paragraph of subdivision (a) of that section) reinforces our conclusion. That paragraph provides: "Nothing in this section shall be construed as affecting the applicability of subdivision (a) of Section 187 of the Penal Code." The plain import is that the section 12022.9 enhancement shall not be interpreted as substituting for, or precluding, a charge and conviction of fetal homicide under section 187.

We therefore find no merit in defendant's claim that section 12022.9 was intended to address lesser degrees of culpability for fetal death than murder under section 187. The enhancement imposed under section 12022.9 instead concerns the greater degree of culpability attributable to a defendant whose felonious conduct injures a pregnant woman and causes the loss of her pregnancy. Thus, defendant's argument that the trial court was obliged to instruct the jury on section 12022.9 as a lesser included offense of fetal murder lacks merit.

■ Also meritless is defendant's contention that the court should have instructed the jury on section 12022.9 for the count concerning Doreen's murder in order to serve as a lesser related alternative to a multiple-murder special-circumstance finding. Defendant argues that, under *Beck* v. *Alabama* (1980) 447 U.S. 625 [100 S.Ct. 2382, 65 L.Ed.2d 392] (*Beck*), the lack of a section 12022.9 instruction improperly narrowed the jury's choices and resulted in an unreliable and arbitrary finding of death eligibility.

In *Beck*, the high court held that a trial court cannot constitutionally impose the death penalty if the jury was not permitted to consider a verdict of guilt of a lesser included noncapital offense that the evidence would have supported. (*Beck*, *supra*, 447 U.S. at p. 627 [100 S.Ct. at p. 2384].) By statute, Alabama had precluded instruction on lesser included offenses in capital prosecutions. (*Id.* at pp. 628-629, fn. 3 [100 S.Ct. at p. 2385] and accompanying text.) The court noted that the practice of allowing conviction of a lesser offense necessarily included in a charged offense originated as an aid to the prosecution in cases where the proof failed on an element of the charged crime. (*Id.* at p. 633 [100 S.Ct. at pp. 2387-2388].) The court recognized, however, that the practice may benefit a defendant by giving a jury a less drastic alternative to the choice between conviction of the charged offense and acquittal. (*Ibid.*) The high court observed in regard to capital

cases: "That safeguard would seem to be especially important in a case such as this. For when the evidence unquestionably establishes that the defendant is guilty of a serious, violent offense—but leaves some doubt with respect to an element that would justify conviction of a capital offense—the failure to give the jury the 'third option' of convicting of a lesser included offense would seem inevitably to enhance the risk of an unwarranted conviction." (*Id.* at p. 637 [100 S.Ct. at p. 2389].) The high court therefore concluded the federal Constitution prohibits a trial court from denying a jury the option of convicting of a lesser included offense if the unavailability of an instruction on that offense enhances the risk of an unwarranted conviction. (*Id.* at p. 638 [100 S.Ct. at p. 2390].)

Defendant's attempt to apply *Beck* to his conviction has two shortcomings. First, the jury was not forced to choose between convicting defendant of a capital offense or acquitting him. The jury was instructed on the lesser included offense of second degree murder with respect to both deaths and was instructed on voluntary manslaughter for Doreen's killing. Thus, there is no ground in this case for *Beck*'s concern that jurors might convict not because they believe the defendant is guilty of a capital offense, but because they simply wish to avoid setting him free. (See *Beck, supra,* 447 U.S. at pp. 633-634 [100 S.Ct. at pp. 2387-2388].) Second, because section 12022.9 is an enhancement and not an offense, it therefore cannot be a lesser included offense to murder. As the high court observed in *Spaziano* v. *Florida* (1984) 468 U.S. 447, 455 [104 S.Ct. 3154, 3159, 82 L.Ed.2d 340]: "Where no lesser included offense exists, a lesser included offense instruction detracts from, rather than enhances, the rationality of the process. *Beck* does not require that result."

*Beck*'s central concern was that a jury's guilt determination would be unreliable because the jurors were forced improperly to make an all-or-nothing choice between a capital verdict and an acquittal. (*Beck, supra,* 447 U.S. at pp. 637-638 [100 S.Ct. at pp. 2389-2390]; *Spaziano* v. *Florida, supra,* 468 U.S. at p. 455 [104 S.Ct. at p. 3159].) The trial court's instructions here gave defendant's jury the option of finding both victims' deaths were only second degree murder, and the additional option of finding Doreen's death was only voluntary manslaughter. "[T]he logic of *Beck* does not apply when, as here, the jury has been properly instructed as to second as well as first degree murder." (*People* v. *Hawkins* (1995) 10 Cal.4th 920, 953 [42 Cal.Rptr.2d 636, 897 P.2d 574], fn. omitted.)

██ We likewise reject defendant's argument that he was entitled to a retrospective application of section 12022.9 under *In re Estrada* (1965) 63 Cal.2d 740 [48 Cal.Rptr. 172, 408 P.2d 948]. ██ There we said: "When

the Legislature amends a statute so as to lessen the punishment it has obviously expressly determined that its former penalty was too severe and that a lighter punishment is proper as punishment for the commission of the prohibited act. It is an inevitable inference that the Legislature must have intended that the new statute imposing the new lighter penalty now deemed to be sufficient should apply to every case to which it constitutionally could apply." (*Id.* at p. 745.) Defendant views section 12022.9 as providing a diminished punishment for killing a fetus. ■ Therefore, he argues the rule in *Estrada* required jury instructions on section 12022.9 in his case.

. ■ The fundamental function of the *Estrada* rule is to further a legitimate legislative intent that is manifested by a change in the punishment prescribed for an offense. When an amendment moderates the punishment for an offense, the ordinary and reasonable inference is that the Legislature determined imposition of the lesser penalty on offenders from then on will sufficiently serve the public interest. (*In re Pedro T.* (1994) 8 Cal.4th 1041, 1045 [36 Cal.Rptr.2d 74, 884 P.2d 1022].)

■ Here, of course, there is no basis for discerning such a legislative intent in the language of section 12022.9. That section did not diminish the punishment for killing a fetus with malice aforethought; the penalties for that offense remain the same as for any other murder. Rather than decreasing the penalty for killing a viable fetus, the crime section 187 was then thought to describe (see *People* v. *Davis, supra,* 7 Cal.4th at pp. 802-805), section 12022.9 increases the punishment for committing an offense that inflicts a singular injury on an expectant mother regardless of fetal viability. This provision hardly suggests the Legislature determined a lesser punishment for fetal murder would serve the public interest. *Estrada* does not apply in these circumstances. (Cf. *In re Pedro T., supra,* 8 Cal.4th at pp. 1045-1046.)

■ We also reject defendant's claims that his trial counsel was ineffective for failing to request an instruction on section 12022.9 as a lesser related offense to fetal murder. Section 12022.9 is not a lesser related offense to murder; it creates an enhancement, not a substantive offense. Our conclusions in this regard make it unnecessary to address defendant's subsidiary claim that he could and would have waived any ex post facto bar to an instruction under section 12022.9.

■ We similarly find no merit in defendant's claim that the prosecutor's decision not to allege section 12022.9 as an alternative to fetal homicide, and the omission of a jury instruction to that effect, denied defendant his rights under the Eighth and Fourteenth Amendments of the United States Constitution. Defendant bases this argument as well on the mistaken premise that

section 12022.9 defines a separate and lesser punishment for killing a fetus than is provided in section 187.

Defendant does not claim the prosecutor's charging decision was the product of invidious discrimination, which generally is the only basis for our review of that discretionary executive function. (See *People* v. *Pinholster* (1992) 1 Cal.4th 865, 971 [4 Cal.Rptr.2d 765, 824 P.2d 571].) Prosecutorial discretion to select cases in which the death penalty will or will not be sought does not, in and of itself, render the death penalty unconstitutional in this case. (*People* v. *Crittenden* (1994) 9 Cal.4th 83, 152 [36 Cal.Rptr.2d 474, 885 P.2d 887]; *People* v. *Keenan* (1988) 46 Cal.3d 478, 505-506 [250 Cal.Rptr. 550, 758 P.2d 1081].) Therefore, the prosecutor's decision to seek two murder convictions for the deaths of Doreen and her fetus and to allege the multiple-murder special circumstance, instead of simply seeking an enhanced prison sentence for Doreen's death, does not of itself evidence an arbitrary and capricious capital punishment system or offend principles of due process, equal protection, or the prohibition of cruel and unusual punishments. (*People* v. *Crittenden, supra,* 9 Cal.4th at p. 152; *People* v. *Keenan, supra,* 46 Cal.3d at pp. 505-506.)

### 2. *Manslaughter Issues*

Defendant presents two arguments for his claim that the trial court should have instructed the jury on manslaughter for the death of the fetus as was done for Doreen's death. First, he contends that trial testimony created a factual issue as to whether the fetus was born alive and thus was a "human being" under the manslaughter statutes. If so, he asserts the jury should have had the option of returning a manslaughter verdict for that death also. Second, defendant claims his rights under the Eighth and Fourteenth Amendments were violated because California law does not include manslaughter as a crime in the death of a fetus. We discuss each argument in turn and conclude that neither has merit.

### a. *The "Live Birth" Claim*

Under the Penal Code, as was true under common law, a fetus is not a "human being" within section 187's definition of murder as "the unlawful killing of a human being . . . ." (*Keeler* v. *Superior Court* (1970) 2 Cal.3d 619, 628, 631 [87 Cal.Rptr. 481, 470 P.2d 617, 40 A.L.R.3d 420].) After *Keeler*, the Legislature amended section 187 specifically to include as murder "the unlawful killing of . . . a fetus . . . ." (Stats. 1970, ch. 1311, § 1, p. 2440.) The Legislature made no similar amendment to section 192's definition of manslaughter as "the unlawful killing of a human being without

malice." As a result, the unlawful killing of a human being, or a fetus, with malice aforethought is murder, but only the unlawful killing of a human being can constitute manslaughter. (*People* v. *Carlson* (1974) 37 Cal.App.3d 349, 355 [112 Cal.Rptr. 321].) There is no crime in California of manslaughter of a fetus. (*People* v. *Brown* (1995) 35 Cal.App.4th 1585, 1592 [42 Cal.Rptr.2d 155]; *People* v. *Apodaca, supra,* 76 Cal.App.3d at pp. 491-492; *People* v. *Carlson, supra,* 37 Cal.App.3d at p. 355.)

Under *Keeler,* the dispositive question is whether the fetus was "born alive," and so became a "human being" within the meaning of the homicide statutes. (*Keeler* v. *Superior Court, supra,* 2 Cal.3d at p. 628.) *Keeler* did not address the indicia that could determine when a fetus is "born alive." The fetus in *Keeler,* though developed to the stage of viability, had suffered a fractured skull *in utero* that caused its immediate death; the fetus was delivered stillborn with no air in its lungs. (*Id.* at pp. 623-624.) Therefore, *Keeler* considered the defendant's act to be the killing of an unborn, though viable, fetus and not the killing a "human being" for purposes of the homicide statutes. (*Id.* at p. 631.)

More recently, *People* v. *Flores* (1992) 3 Cal.App.4th 200 [4 Cal.Rptr.2d 120] discussed this issue in the context of a defendant charged with gross vehicular manslaughter while intoxicated in violation of section 191.5, subdivision (a). There, after the defendant's car collided with a pregnant woman's car, doctors attempted to deliver her eight-and-one-half-month-old fetus by emergency cesarean section. (*People* v. *Flores, supra,* 3 Cal.App.4th at pp. 203-204.) The fetus had a faint, weak heartbeat that lasted for a few minutes, but the evidence failed to show it ever had breathed independently. (*Id.* at p. 204.) The medical examiner testified that death occurred during the perinatal period, defined as the time immediately before, during, and after birth. (*Id.* at p. 205.)

*Flores* reviewed the common law antecedents that *Keeler* noted, which suggested that one of the tests for a live birth was an independent circulation and that evidence of breathing alone may not be conclusive. (*People* v. *Flores, supra,* 3 Cal.App.4th at pp. 206-207.) *Flores* also analyzed the earlier decision in *People* v. *Chavez* (1947) 77 Cal.App.2d 621 [176 P.2d 92]. From that case *Flores* drew the rule that a killing during the birth of a demonstrably alive and viable fetus is the killing of a human being, if the birth would in the natural course of events be completed successfully. (*People* v. *Flores, supra,* 3 Cal.App.4th at pp. 208-209; see also *Keeler* v. *Superior Court, supra,* 2 Cal.3d at pp. 637-638.) *Flores* read *Chavez* as establishing that evidence of independent heart and lung action is sufficient evidence the infant was born alive. (*People* v. *Flores, supra,* 3 Cal.App.4th at p. 209.)

From these and other authorities, *Flores* attempted to distill the criteria that can establish a live birth under common law standards. The court stated: "Heart action, or circulation, is not enough in itself to sustain life; there also must be respiration. Consequently, a faint heartbeat lasting only briefly generally is insufficient in the absence of other signs of life. [Citation.] [¶] Conversely, if there is evidence of independent respiration, this generally establishes an independent circulation and existence. [Citation.] However, that a fetus/infant takes but a few spontaneous breaths and then immediately ceases breathing will not establish a live birth, i.e., an independent existence, for such evidence supports only the possibility and that is insufficient. [Citation.]" (*People* v. *Flores*, *supra*, 3 Cal.App.4th at p. 209.)

*Flores* found a more authoritative and appropriate test, however, by looking to the statutory definition of death stated in Health and Safety Code section 7180, subdivision (a).[8] Reasoning that life is the obverse of death, and that common law definitions should be used only when there is no statutory definition, the *Flores* court held that for life to be present, both of the statute's disjunctive prongs must be absent. (*People* v. *Flores*, *supra*, 3 Cal.App.4th at p. 210.) *Flores* concluded that evidence of an independent heartbeat alone could be sufficient to show circulation and respiration had not irreversibly ceased. (*Ibid.*) However, the court also said a conclusion that life exists requires more. At least, there must be evidence of brain stem activity, such as an attempt to breathe independently. (*Id.* at pp. 210-211.)

Defendant contends substantial evidence shows the fetus was born alive and thus died as a human being. Therefore, he asserts the trial court should have instructed the jury on manslaughter as a lesser included offense to murder for that death, as the trial court did for Doreen's killing.

However, we need not decide in this case what evidence is sufficient to establish a fetus was born alive so as to be a "human being" as the term is used in the homicide statutes. We therefore also have no occasion to discuss what circumstances could have required a manslaughter instruction in this case. The record here lacks substantial evidence of any indicia that the fetus was born alive. ■ " '[D]ue process requires that a lesser included offense instruction be given *only* when the evidence warrants such an instruction.' [Citations.]" (*People* v. *Kaurish* (1990) 52 Cal.3d 648, 696 [276 Cal.Rptr. 788, 802 P.2d 278], quoting *Hopper* v. *Evans* (1982) 456 U.S. 605, 611 [102 S.Ct. 2049, 2052-2053, 72 L.Ed.2d 367], italics in *Hopper*.)

---

[8]Health and Safety Code section 7180, subdivision (a), states, in pertinent part: "An individual who has sustained either (1) irreversible cessation of circulatory and respiratory functions, or (2) irreversible cessation of all functions of the entire brain, including the brain stem, is dead."

Substantial evidence in this context is evidence from which a rational trier of fact could find beyond a reasonable doubt the elements of the lesser offense. (*People* v. *Berryman* (1993) 6 Cal.4th 1048, 1081 [25 Cal.Rptr.2d 867, 864 P.2d 40].) "[S]peculation is not evidence, less still substantial evidence. [Citation.]" (*Ibid.*)

■ The expulsion of the fetus from Doreen's womb in no way resembled the live birth of a human being. The chief medical examiner and coroner testified in detail concerning the objective findings made during the autopsy of Doreen and her fetus. Defendant's attack on Doreen inflicted many deep wounds, including a gaping, nine-inch-long wound to her abdomen and a parallel five-and-one-half-inch-long chopping wound. Multiple cuts penetrated her abdomen and uterus while the fetus was inside. The cuts passed through or around the fetus and into the placenta, which remained inside Doreen's abdomen. There were four cuts in the umbilical cord, which was still attached to the placenta; one cut severed the umbilical cord close to the fetus's body. The fetus was expelled through the large abdominal wound.

The fetus too sustained many cutting wounds. A cut to the head penetrated into the bone. The left leg was severed below the knee. A large, five-inch wound cut through half of the fetus's body. The wound extended from the upper right abdomen through the left chest and to the left armpit, cutting through the shoulder blade, the second thoracic vertebra, the liver, and one lung, and transecting the heart. This wound stopped the heart and circulation. Examination of the lungs demonstrated they had never been expanded, and there was no air in them. The fetus never breathed or lived independently of Doreen. The injuries to Doreen and her fetus prevented the fetus from ever breathing.

Against this physical evidence and expert opinion, defendant offers one ambiguous piece of testimony to establish his position. As Charles Erbert testified about what he did when he came home and found his wife and the fetus lying in a blood-covered hallway, the prosecutor asked if his daughter Deanna had tried to come to him. Charles answered: "I remember I turned around and I saw her standing there. I went over and grabbed her, and I took her around the kitchen area so she would—couldn't see. I guess—she said she saw the whole—she came out, she heard the baby crying."[9] Defendant construes this passage as meaning Deanna told her father that she heard the

---

[9]Deanna was four years old when her mother was killed. She was eight when she testified at trial, and did not remember much about the traumatic attack on her mother. She recalled that she heard a man say to Doreen, "I'm going to kill you." Doreen told Deanna to get behind the couch, so Deanna ran out of the hallway and hid behind the couch. She went into the kitchen briefly and peeked; she could not remember what happened. Deanna could recall only

fetus crying during the attack. Defendant characterizes this as evidence of independent breathing such that the court should have had the jury decide whether the fetus was born alive. To the contrary, no rational finder of fact could have reached that conclusion based on this fragment of Charles Erbert's testimony. There simply was not substantial evidence that the fetus was born alive under any recognized criteria.

### b. *Exclusion of Feticide From Manslaughter*

■ Defendant argues his rights under the Eighth and Fourteenth Amendments were violated because California's statutory scheme contains no provision for the crime of manslaughter in the killing of a fetus. He contends the statutory scheme is unconstitutional because it requires a finding of death eligibility whenever a defendant is found guilty of the first degree murder of a pregnant woman and any degree of murder of her fetus. Defendant suggests there is an inherent bias whenever the jury finds first degree murder of the mother. In these cases, defendant argues, the jury must then find the multiple-murder special circumstance to be true if it finds either degree of murder as to the fetus. The jury's only other choice at that point would be to find no crime for the fetus's death, because it does not have the option of a manslaughter verdict. This procedure, defendant contends, results in the unreliable, arbitrary, and capricious application of the death penalty in cases of feticide, particularly where the fetal killing is not first degree murder.

Defendant further argues this scheme also violates equal protection because these double killings are treated differently from other multiple murders solely because the second killing was a feticide. All other defendants charged with multiple-murder special circumstances are entitled to manslaughter instructions for any killing if the evidence of malice is sufficiently doubtful to support instruction on the lesser included offense.

As the Attorney General observes, these arguments simply recast defendant's assertions of a constitutional entitlement to jury instructions on the section 12022.9 enhancement as a lesser included or lesser related offense. That California law does not provide for the crime of manslaughter of a fetus does not result in an unreliable death eligibility determination if a defendant is charged with a multiple-murder special circumstance for the deaths of a pregnant woman and her fetus.

The due process concern for a reliable factfinding process in capital cases that underlies *Beck, supra*, 447 U.S. 625, is not implicated solely because a

---

hearing the man's voice and her mother's, but not what they said. She went back to hiding behind the couch until she heard her father come home.

defendant does not have a full panoply of lesser charges made available to the jury. (*Schad* v. *Arizona* (1991) 501 U.S. 624, 645-646 [111 S.Ct. 2491, 2504-2505, 115 L.Ed.2d 555].) "Our fundamental concern in *Beck* was that a jury convinced that the defendant had committed some violent crime but not convinced that he was guilty of a capital crime might nonetheless vote for a capital conviction if the only alternative was to set the defendant free with no punishment at all." (*Schad* v. *Arizona, supra,* 501 U.S. at p. 646 [111 S.Ct. at p. 2504].) These concerns do not arise when the jury, as here, is not faced with that all-or-nothing choice between capital murder and acquittal. (*Id.* at p. 647 [111 S.Ct. at p. 2505].) As we have already discussed, defendant's jury had several choices other than acquittal and capital murder in assessing his culpability for killing Doreen and her fetus. The trial court's instructions allowed the jury to return verdicts of second degree murder for both deaths and gave the jury the additional option of a verdict of voluntary manslaughter with respect to Doreen's killing.·

We do not find arbitrary, capricious, or irrational the distinction between a defendant whose jury may consider several manslaughter verdicts because of the state of the evidence and the victims' status, and a defendant whose jury may consider only one manslaughter verdict because the victims were a pregnant woman and her unborn fetus. The Legislature could reasonably and rationally conclude the unlawful killing of a fetus should be punished when committed with express or implied malice, but that when such a killing occurs "upon a sudden quarrel or heat of passion" (§ 192, subd. (a)), the punishment for the crime against the mother is sufficient.

In any event, it appears that a manslaughter instruction even as to Doreen's death was not called for in this case. The killings could not have occurred in a sudden quarrel or heat of passion. (§ 192, subd. (a).) They took place four years after the death of defendant's son and two years after the verdict in his wrongful death case. There was no claim of imperfect self-defense. The trial court gave no instructions on these theories. Instead, the court instructed the jury that mental disease or disorder could negate malice so that defendant's killing of Doreen could be the offense of manslaughter. This instruction was improper after the abolition of the diminished capacity defense, which occurred before defendant killed Doreen and her fetus. (See *People* v. *Saille* (1991) 54 Cal.3d 1103, 1115-1117 [2 Cal.Rptr.2d 364, 820 P.2d 588].) Of course, any error in giving a manslaughter instruction was harmless given the jury's verdict of murder.

### 3. *The Disproportionate Penalty Claim*

In a related argument, defendant asserts the application of the multiple-murder special circumstance to the crimes of killing a pregnant

woman and her fetus constitutes a disproportionate penalty violating the state and federal Constitutions. Although we rejected this argument in *People* v. *Bunyard* (1988) 45 Cal.3d 1189, 1239-1241 [249 Cal.Rptr. 71, 756 P.2d 795] (*Bunyard*), defendant contends that case is distinguishable. We disagree.

In *Bunyard*, a jury convicted the defendant of the first degree murders of his wife and her healthy full-term fetus. The jury also found true a multiple-murder special circumstance and imposed the death penalty. The defendant contended that application of the multiple-murder special circumstance to situations in which one of two victims was a fetus would be unconstitutional as a disproportionate penalty under the state or federal Constitution. We rejected the argument.

We observed in *Bunyard* that "In determining whether a particular sentence constitutes cruel or unusual punishment under the state Constitution (art. I, § 17), we must determine whether the penalty 'is so disproportionate to the crime for which it is inflicted that it shocks the conscience and offends fundamental notions of human dignity.' (*In re Lynch* [(1972)] 8 Cal.3d [410,] 424 [105 Cal.Rptr. 217, 503 P.2d 921]; *People* v. *Frierson* (1979) 25 Cal.3d 142, 183 [158 Cal.Rptr. 281, 599 P.2d 587].) Defendant presents no evidence or argument regarding two of the factors we held relevant in determining disproportionality under *Lynch*—the nature of the offense and/or the offender, with particular regard to the degree of danger both present to society, and whether more serious crimes are punished in this state less severely than the offense in question. The offense at issue—willful, deliberate and premeditated murder—creates the utmost danger to society. The fact that the victim murdered is an unborn child does not render defendant less culpable, or the crime less severe, in light of the Legislature's determination that viable fetuses receive the same protection under the murder statute as persons." (*Bunyard, supra,* 45 Cal.3d at p. 1240.)

As for the federal Constitution, *Bunyard* held that "Defendant's arguments suggesting a potential Eighth Amendment violation also fail. Our high court has established that one of the objective factors for reviewing the proportionality of sentences under the Eighth Amendment is the 'gravity of the offense.' Murder is the gravest of all, a crime 'so grievous an affront to humanity that the only adequate response may be the penalty of death.' (*Gregg* v. *Georgia* (1976) 428 U.S. 153, 184 [96 S.Ct. 2909, 2930, 49 L.Ed.2d 859, 881].) Since the evidence in this case was sufficient to establish that defendant acted with express malice towards [the fetus], this case raises no questions of death-eligibility under *Tison* v. *Arizona* (1987) 481 U.S. 137 [107 S.Ct. 1676, 95 L.Ed.2d 127]. 'A critical facet of the individualized determination of culpability required in capital cases is the mental

state with which the defendant commits the crime. Deeply engrained in our legal tradition is the idea that the more purposeful is the criminal conduct, the more serious is the offense, and therefore, the more severely it ought to be punished.' (*Tison, supra,* 481 U.S. at p. 156 [95 L.Ed.2d at p. 143, 107 S.Ct. at p. 1687].) Additionally, defendant fails to present any evidence or argument concerning other relevant criteria for reviewing a claim of Eighth Amendment violation—the sentencing decisions made by juries, and the charging practices of prosecutors—with respect to the imposition of the death penalty for the murder of a pregnant woman and her viable fetus. [¶] . . . [¶] In sum, we find no federal or state constitutional infirmity in applying the multiple-murder special circumstance to the circumstances in this case." (*Bunyard, supra,* 45 Cal.3d at pp. 1240-1241.)

Defendant observes that although *Bunyard* concerned two first degree murders, he was convicted of first degree murder of Doreen, but only second degree murder of her fetus. Defendant notes the jury made no express finding of his premeditation, deliberation, or intent to kill the fetus, and he suggests the jury's verdict may even imply a finding he was unaware of the fetus's existence. We disagree. The jury's verdict of second degree murder necessarily found that at the very least, defendant bore implied malice toward the fetus. (See *People* v. *Nieto Benitez* (1992) 4 Cal.4th 91, 102-103 [13 Cal.Rptr.2d 864, 840 P.2d 969].) The jury was so instructed.

The Legislature has provided that the multiple-murder special circumstance applies whenever the defendant has been convicted "of more than one offense of murder in the first *or second degree.*" (§ 190.2, subd. (a)(3), italics added.) Although we stressed in *Bunyard* that the willful and malicious nature of the defendant's murders amply qualified him for the death penalty (*Bunyard, supra,* 45 Cal.3d at p. 1240), we did not suggest that imposing that penalty for a multiple murder involving the first degree murder of a woman and the second degree murder of her fetus would be constitutionally suspect. Special circumstances accompany many kinds of first degree murder involving only *one* victim, such as murder of a peace officer, firefighter, prosecutor, judge, juror, elected official, or witness to a crime, as well as single victims killed by explosive device, or because of race, color or religion, or while defendant was avoiding arrest, escaping from custody, lying in wait, or engaged in certain felonies. (See § 190.2.) We see nothing disproportionate or constitutionally suspect about also imposing the death penalty in cases involving the intentional first degree murder of a pregnant woman accompanied by the murder, whether of first or second degree, of her fetus. Under the circumstances of this case, the death penalty neither "shocks the conscience" nor "offends fundamental notions of human dignity." (*In re Lynch* (1972) 8 Cal.3d 410, 424 [105 Cal.Rptr. 217, 503 P.2d 921].) Contrary to

defendant's argument, the facts that he had no prior criminal record and previously had been a productive member of society, although relevant to the jury's penalty determination, do not themselves render the sentence disproportionate.

 Defendant claims to be "the sole person within California to receive the death sentence for a first degree murder of a pregnant woman and a second degree murder of a fetus." This claim may reflect the past tendency of juries to find first degree murder of the fetus in these cases. Fortunately, as compared to many other forms of murder, dual murders of this kind appear to be rare, but rarity does not equal disparity. In any event, as the Attorney General observes, our decisions do not mandate intercase proportionality review, and the possibility that other persons who committed similar crimes may have received lesser sentences does not establish disproportionate punishment. (See *People* v. *Crittenden, supra,* 9 Cal.4th at pp. 156-157.)

Defendant further contends that by enacting section 12022.9, the Legislature punishes less severely the same fetal killing that made him eligible for the death penalty. Here again he relies on his mistaken view of the import of section 12022.9. As we have already discussed, section 12022.9 imposes a five-year enhancement for any person who, during the commission of a felony, knowingly and intentionally inflicts injury causing the termination of the victim's pregnancy. The enhanced punishment is imposed for the particular injury to which a pregnant woman is uniquely vulnerable. This provision may offer prosecutors in an appropriate case a charging option different from charging feticide, but it does not demonstrate the disproportionality of the special circumstance charged in the present case. (See *People* v. *Crittenden, supra,* 9 Cal.4th at p. 157.)

### 4. *Instructions on Malice*

 Defendant contends the jury instructions were deficient and erroneous because they did not separately define malice in terms that related specifically to the fetus. He argues the instructions therefore improperly permitted the jury to transfer the malice found in Doreen's killing to the killing of the fetus. Defendant deems the alleged error to be of constitutional dimension on the theory that an essential element was omitted from the instructions on the fetal murder charge. He thus concludes that his federal constitutional due process and jury trial rights were violated, and that he was subjected to an unreliable and capricious finding of guilt in a capital case in violation of the Eighth and Fourteenth Amendments. Defendant's contentions are meritless.

The trial court read to the jury defendant's requested instruction on malice, as follows: "There's a definition of malice aforethought. Malice may be either express or implied. Malice is express when there is manifested an intention unlawfully to kill a human being. [¶] Malice is implied when the killing results from an intentional act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows his conduct endangers the life of another and who acts with a conscious and wanton disregard for human life and for a base anti-social purpose. [¶] When it is shown that the killing results from the intentional act with express or implied malice, no other mental state need be shown to establish the mental state of malice aforethought. [¶] The mental state constituting malice aforethought does not necessarily require any ill will or hatred of the person killed. [¶] Aforethought does not imply deliberation or the lapse of considerable time. It only means that the required mental state must precede rather than follow the act." (See CALJIC No. 8.11.)

Defendant notes that the instruction limited express malice to a manifested "intention unlawfully to kill a *human being*." (Italics added.) He also notes the trial court told the jury that "a viable fetus is not a human being for purposes of the crime of manslaughter . . . ." He then argues the combined effect of the instructions allowed the jury to apply any malice found towards Doreen to the killing of the fetus, allowing a second degree murder verdict without a separate finding of malice with respect to the fetus. Defendant asserts that, under the instructions, the malice required for fetal murder would have been established by the jury's finding defendant acted with an intent to kill Doreen or a wanton disregard for her life.

If defendant believed the instructions were incomplete or needed elaboration, it was his obligation to request additional or clarifying instructions. (*People* v. *Carpenter* (1997) 15 Cal.4th 312, 391 [63 Cal.Rptr.2d 1, 935 P.2d 708].) His failure to do so waives the claim in this court. (*People* v. *Sully* (1991) 53 Cal.3d 1195, 1218 [283 Cal.Rptr. 144, 812 P.2d 163].)

Even if we considered defendant's argument on its merits, it would fail. As the Attorney General points out, the trial court told the jury not to single out any individual point or instruction: "You are to consider all the instructions as a whole and are to regard each in the light of all the others." The instructions made plain that malice was a separate element that had to be proved for each of the two murders charged. The trial court instructed the jury that a verdict of guilt of the alleged fetal murder required a finding that defendant killed the fetus with malice aforethought. The court gave no instruction on transferred intent that could have suggested to the jury that malice towards Doreen could satisfy the element of malice for the fetal

murder as well. It is not reasonably likely the instructions misled the jury into thinking it could convict defendant of two murders while finding malice aforethought only as to one victim's death. (Cf. *People* v. *Berryman, supra,* 6 Cal.4th at p. 1078; *Bunyard, supra,* 45 Cal.3d at p. 1230.)

We also note again that the jury found defendant guilty of second degree murder for killing the fetus. The jury instructions explicitly and repeatedly stated that a conviction for murder of a viable human fetus required proof that the killing was done "with malice aforethought." The instructions on second degree murder included both express and implied malice: "Murder of the second degree is the unlawful killing of a human being with malice aforethought when there is manifested an intention unlawfully to kill a human being, but the evidence is insufficient to establish deliberation and premeditation. [¶] Murder of the second degree is also the unlawful killing of a human being as the direct causal result of an intentional act involving a high degree of probability that it will result in death, which act is done for a base anti-social purpose and with wanton disregard for human life. [¶] In other words, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of another, and who acts with conscious disregard for human life. [¶] When the killing is the direct result of such an act, it is not necessary to establish that the defendant intended that his act would result in the death of a human being."

The verdict on the fetal murder charge plainly shows that the jury was not confused by the reference to "human being" in the second degree murder instruction. By the same token, only speculation could suggest the jury thought that the malice instruction's references to "human being" and "human life" excluded the fetus. Nothing suggests the jury believed that finding proof of malice for Doreen's killing obviated the need to find defendant killed her fetus with malice aforethought. (Cf. *People* v. *Pensinger* (1991) 52 Cal.3d 1210, 1245-1246 [278 Cal.Rptr. 640, 805 P.2d 899].)

### 5. *Intent to Kill and Multiple-murder Special Circumstance*

Defendant argues that because the prosecution charged him with the multiple-murder special circumstance, the trial court erred by not instructing the jury that it had to find he had the intent to kill both victims in order to find the special circumstance true. However, defendant's argument would require us to extend the now-overruled decisions in *Carlos* v. *Superior Court* (1983) 35 Cal.3d 131 [197 Cal.Rptr. 79, 672 P.2d 862] (*Carlos*), and *People* v. *Turner* (1984) 37 Cal.3d 302 [208 Cal.Rptr. 196, 690 P.2d 669] (*Turner*). Defendant's attempt to have us develop further the mistaken

premises of *Carlos* and *Turner* must fail. (See *People* v. *Anderson* (1987) 43 Cal.3d 1104, 1143, 1149 [240 Cal.Rptr. 585, 742 P.2d 1306] (*Anderson*).)

In December 1983, *Carlos* held that intent to kill was an essential element of the felony-murder special circumstance. (*Carlos, supra,* 35 Cal.3d at pp. 134-135.) Eleven months later, on October 31, 1984, defendant committed his crimes against Doreen and her fetus. The following month, on November 21, 1984, we held that two first degree felony-murder convictions, *neither* of which was supported by jury instructions on the element of intent to kill, could not satisfy the multiple-murder special circumstance. (*Turner, supra,* 37 Cal.3d at pp. 328-329.) Three years later, we overruled both *Carlos* and *Turner* and held that, when the defendant is the actual killer, intent to kill is not an element of either the felony-murder special circumstance or the multiple-murder special circumstance. (*Anderson, supra,* 43 Cal.3d at pp. 1138-1147, 1149-1150.) Since that time, we have said that, when a felony-murder special circumstance is alleged to have occurred in the "window period" after *Carlos* and before *Anderson,* the intent-to-kill requirement must be applied to satisfy due process and ex post facto principles. (*People* v. *Johnson* (1993) 6 Cal.4th 1, 44-45 [23 Cal.Rptr.2d 593, 859 P.2d 673]; *People* v. *Fierro* (1991) 1 Cal.4th 173, 227 [3 Cal.Rptr.2d 426, 821 P.2d 1302]; *People* v. *Ashmus* (1991) 54 Cal.3d 932, 981 [2 Cal.Rptr.2d 112, 820 P.2d 214].) The reason for this last rule is that retroactive application of *Anderson* in those circumstances would deprive the defendant of a defense against the death penalty that the law would have permitted at the time of the crime. (*People* v. *Fierro, supra,* 1 Cal.4th at p. 227.)

We note first that defendant was not tried on a felony-murder theory or a felony-murder special-circumstance allegation. Thus, *Carlos*'s holding does not apply to the circumstances of his crimes. The intent-to-kill requirement established in *Carlos, supra,* 35 Cal.3d at pages 134-135, was extended to multiple-murder special-circumstance cases only after defendant killed Doreen and her fetus, when we decided *Turner.* Even then, *Turner*'s development of *Carlos* resulted from the prosecution's reliance on two felony murders to support a multiple-murder special-circumstance finding, although neither felony-murder conviction could satisfy *Carlos.* (*Turner, supra,* 37 Cal.3d at pp. 328-329.)

We have never held that the multiple-murder special circumstance requires a jury to find the defendant intended to kill every victim. We also have never held that the intent to kill one victim and the implied malice murder of a second victim is insufficient to establish a multiple-murder special circumstance.

Consequently, applying *Anderson, supra,* 43 Cal.3d 1104, to defendant's crimes poses no due process or ex post facto problems. (See *People* v.

*Kaurish, supra,* 52·Cal.3d at pp. 696-697; *People* v. *Poggi* (1988) 45 Cal.3d 306, 326-327 [246 Cal.Rptr. 886, 753 P.2d 1082].) Indeed, we have observed before that no intent to kill was required to prove the multiple-murder special circumstance when the offenses transpired before *Turner* was decided. (*People* v. *Marshall* (1996) 13 Cal.4th 799, 852, fn. 10 [55 Cal.Rptr.2d 347, 919 P.2d 1280].) Moreover, *Turner* is inapplicable when, as here, a defendant is tried and convicted on a theory of deliberate, premeditated murder, not felony murder. (See *Bunyard, supra,* 45 Cal.3d at p. 1241; *People* v. *Dyer* (1988) 45 Cal.3d 26, 68 [246 Cal.Rptr. 209, 753 P.2d 1].)[10] None of *Turner's* concerns about imposing the death penalty for an unintentional killing is involved in sentencing defendant to death for his first degree murder of Doreen. (See *Turner, supra,* 37 Cal.3d at p. 329.)

## 6. *Prosecutorial Misconduct Claims*

Defendant next contends the prosecutor committed misconduct during the guilt phase. ■ Because defense counsel failed to object or seek an admonishment as to any of these asserted instances of misconduct, defendant

---

[10]There is no merit to defendant's effort to construe our decision in *People* v. *Johnson, supra,* 6 Cal.4th at pages 44-47, as establishing not only that *Turner, supra,* 37 Cal.3d 302, applies to any offense that occurred between *Carlos, supra,* 35 Cal.3d 131, and *Anderson, supra,* 43 Cal.3d 1104, but also that *Carlos* and *Turner* required a finding of intent to kill *all* victims for a multiple-murder special-circumstance allegation. As our opinion stated, we simply presumed that *Turner's* rule, after *Anderson,* would have a "window period," as did *Carlos.* (*People* v. *Johnson, supra,* 6 Cal.4th at pp. 44-45.) However, we did not need to decide the question whether that presumption was true, and if so, what the "window period" would be. The Attorney General conceded that *Carlos* error occurred in that case, and so we proceeded to determine whether the error was harmless beyond a reasonable doubt. (*People* v. *Johnson, supra,* 6 Cal.4th at p. 45.) We concluded the error in *Johnson* was harmless because the evidence of defendant's intent to kill both victims was overwhelming, and the jury could have had no reasonable doubt on that matter. (*Id.* at pp. 45-47.) In *Johnson* we had neither an occasion nor a reason to decide whether *Carlos* and *Turner* required a finding of intent to kill each victim; we simply found overwhelming evidence that the defendant had such an intent. (*People* v. *Johnson, supra,* 6 Cal.4th at pp. 45-47.) Therefore, *Johnson* neither discussed nor offered authority for the rule defendant now proposes. Accordingly, *Johnson* constitutes neither support nor authority for such a rule.

Similarly, defendant's case is distinguishable from *People* v. *Williams* (1997) 16 Cal.4th 635 [66 Cal.Rptr.2d 573, 941 P.2d 752], to which he referred at oral argument. In *Williams,* the defendant was tried as an aider and abettor and charged with the special circumstance of multiple murder for crimes occurring on August 31, 1984. (*Id.* at p. 688.) The prosecution conceded that the jury instructions should have included intent to kill as an element of the special circumstance finding for multiple murder. (*Id.* at p. 687.) However, *Williams* is not authority for applying *Turner* generally to offenses that occurred before that case was decided. Even after *Anderson,* intent had to be proved when the defendant was an aider and abettor rather than the actual killer. (*Anderson, supra,* 43 Cal.3d at p. 1149.) As *Anderson* made clear, the intent-to-kill requirement for aiders and abettors flowed from the statutory language. (*Id.* at pp. 1143, 1149.) Here, of course, it was conceded at trial that defendant was the actual killer.

has waived the point for appeal unless an admonition would have been useless to cure the alleged harm. (E.g., *People* v. *Price* (1991) 1 Cal.4th 324, 447 [3 Cal.Rptr.2d 106, 821 P.2d 610].) We briefly review the various items of claimed misconduct and conclude none was so grave that an admonition would not have cured the harm it assertedly caused. Therefore none of the claims is cognizable. Each also lacks merit.

### a. *Opening Statement*

 Defendant asserts the prosecutor made unsupported and inflamma- tory remarks during her opening statement. The prosecutor referred several times to the victim's young daughter, Deanna, a witness to the murders, in terms that could be expected to gain sympathy for her. (E.g., "She was to feel death's very presence in her own home where she felt normally very safe indeed.") The prosecutor referred to facts defendant asserts were not in evidence, including what Deanna probably saw and heard during the mur- ders, and that defendant took his mask off so that Doreen would see his face.

None of the cited instances of supposed misconduct was so aggravated that any potential harm could not have been avoided by an admonition. Indeed, immediately after the prosecutor's opening statement, the court admonished the jury that counsels' statements were not evidence. Therefore, defendant waived any claim of prosecutorial misconduct during the opening statement.

Moreover, the portions of the prosecutor's opening statement defendant cites were not improper. The function of an opening statement is not only to inform the jury of the expected evidence, but also to prepare the jurors to follow the evidence and more readily discern its materiality, force, and meaning. (*People* v. *Harris* (1989) 47 Cal.3d 1047, 1080 [255 Cal.Rptr. 352, 767 P.2d 619].) The comments that touched on Deanna's experiences simply gave the jury a context for the evidence of the killings. Although the prosecutor's language was dramatic, her otherwise proper opening statement did not become objectionable because she delivered it in a manner meant to hold the jurors' attention. As the Attorney General observes, some comment on the murders' effect on Deanna was reasonably necessary and unavoidable to prepare the jury for the difficulties and gaps in her testimony. The circumstances of the killings and their impact on Deanna would be obvious to the jury in any event.

As to the statements of what Deanna saw and heard, and that defendant removed his mask so that Doreen would see him, the testimony eventually admitted at trial substantially supported the prosecutor's comments and

inferences. Defendant left the wolf mask relatively unbloodied near the door, suggesting that he took it off after entering the house but before attacking Doreen. Deanna's testimony essentially tracked the prosecutor's statements as well. As mentioned earlier, the trial court admonished the jury immediately after the prosecutor's opening statement not to mistake counsel's statements for evidence. Thus, any minor variance in the evidence actually presented could not be so prejudicial or egregious as to warrant reversal. (*People* v. *Harris, supra,* 47 Cal.3d at p. 1080.)

### b. *Cross-examination of Defense Expert*

Defendant additionally assigns as misconduct several instances in the prosecutor's cross-examination of a defense expert, Dr. Benson. The prosecutor asked Dr. Benson if he had ever testified for the prosecution in cases involving sodium amytal interviews. Defendant contends she did so knowing the witness's negative response would suggest a pro-defense bias. Defendant also asserts the prosecutor committed misconduct by referring to facts not in evidence when she cross-examined Dr. Benson on his opinion that defendant did not know Doreen was pregnant. In particular, defendant criticizes the prosecutor's statements that defendant's stepmother and brother knew of Doreen's pregnancy. Defendant also cites the prosecutor's questioning the doctor's acceptance of defendant's statements about the fetus "just popping out" in light of the doctor's review of the crime scene photographs and the autopsy reports.

None of these alleged instances of misconduct was so aggravated that an admonition could not have avoided any potential harm. As previously noted, the court admonished the jury that counsel's questions and statements were not evidence.[11] The court also instructed the jury not to accept as true any insinuation suggested by a question. Consequently, the absence of an objection waives any prosecutorial misconduct claim.

In any event, counsel may cross-examine an expert witness more extensively and searchingly than a lay witness, and the prosecution was entitled to attempt to discredit the expert's opinion. (*People* v. *Hendricks* (1988) 44 Cal.3d 635, 642 [244 Cal.Rptr. 181, 749 P.2d 836].) In cross-examining a psychiatric expert witness, the prosecutor's good faith questions are proper even when they are, of necessity, based on facts not in evidence. (*People* v. *Nye* (1969) 71 Cal.2d 356, 374-376 [78 Cal.Rptr. 467, 455 P.2d 395].) The

---

[11]Indeed, after the prosecutor's allegedly improper suggestion of bias, the court commented: "[T]he prosecution doesn't have access to a defendant for the purpose of drug testing. Maybe that's one of the reasons why the doctor never testified in that regard." The prosecutor also acknowledged to the court that "I don't think we're allowed to do the process . . . ." If there was any error in the prosecutor's original question, the court's comments cured it.

record does not disclose bad faith on the prosecutor's part in her cross-examination of Dr. Benson. Given Dr. Benson's opinion and his acceptance of defendant's statements to him, the prosecutor's cross-examination permissibly tested the credibility of that acceptance.

### c. Prosecutor's Closing Argument

 Defendant next argues the prosecutor committed misconduct during her closing argument. Defense counsel objected to none of these statements, which we briefly describe. In each instance, a prompt objection and request for admonition would readily have cured the supposed misconduct.

The prosecutor assertedly disparaged Dr. Benson's testimony, telling the jury it could reject the defense's psychiatric testimony "out of hand" under instructions which allowed the jury to disregard expert testimony it found to be "unreasonable." According to defendant, the prosecutor also inaccurately described Dr. Benson's testimony and misstated the number of transcript pages devoted to his testimony on defendant's mental state during the murders. Additionally, defendant claims the prosecutor improperly stated that Dr. Benson's testimony was "made for the court" rather than having independent "intrinsic validity" in the form of a written report, and that Dr. Benson failed to perform certain necessary tests. The prosecutor also characterized as a "script" or a "set up" the questions Dr. Benson and defense counsel prepared for defendant's sodium amytal interview.

Defendant also complains the prosecutor supposedly made improper and inaccurate references to arguable omissions from Dr. Benson's interview, to a report by Dr. French not admitted in evidence, and to a report by Dr. Stevenson that was admitted. Further, defendant contends the prosecutor misstated the evidence regarding whether defendant told anyone Doreen murdered his son and unfairly disparaged defense counsel by accusing him of "vilifying" Doreen and Charles Erbert.

Defendant likewise accuses the prosecutor of improperly characterizing his motive in bringing his civil wrongful death suit against Charles and Doreen, misdescribing the defense theory of the case, and mischaracterizing defendant's motive for the murders. Finally, defendant contends the prosecutor misstated Dr. Hauser's testimony regarding the manner in which the killings occurred, improperly and incorrectly asserted the evidence showed defendant intentionally killed the fetus, speculated regarding the murder scene and defendant's state of mind during the slayings, and mischaracterized the evidence regarding defendant's presence in the Erbert neighborhood on an earlier occasion.

As with defendant's claim that the prosecutor committed misconduct during her opening statement, defendant objected to none of the supposed instances of misconduct. Defendant argues that the misconduct was so extensive that "it would overcome the ameliorative benefit of any admonition, and so egregious as to render appellant's trial fundamentally unfair." To the contrary, our review of the record indicates that, however close the prosecutor may have occasionally come to the bounds of "fair comment" on the evidence, none of the purported misdescriptions, misstatements, or misrepresentations defendant cites was so outrageous or inherently prejudicial that an admonition could not have cured it.

As we stated in *People* v. *Carrera* (1989) 49 Cal.3d 291, 320 [261 Cal.Rptr. 348, 777 P.2d 121], where the prosecutor did overstep the boundary of permissible argument, "The [prosecutor's] misstatements, although bearing a potential for prejudice, were not so extreme or so divorced from the record that they could not have been cured by prompt objections and admonitions. [Citation.]" (See also *People* v. *Medina* (1990) 51 Cal.3d 870, 895 [274 Cal.Rptr. 849, 799 P.2d 1282].) As we previously observed, the court cautioned the jury that counsel's arguments were not evidence and should not be considered as such.

Defendant states that, unlike prior cases, the prosecutor's misconduct in this case was "pervasive" and extended throughout closing argument. Under such circumstances, according to defendant, he should be excused from making "repeated objections," which might have had a negative effect on the jury. (See *People* v. *Kirkes* (1952) 39 Cal.2d 719, 726 [249 P.2d 1].) The problem is that defendant made *no objections whatever* to the various instances of asserted misconduct cited above. As in *People* v. *Medina, supra,* 51 Cal.3d at page 895, "a timely objection and admonition by the court at the outset might have tempered the prosecutor's aggressiveness *before* it became so extreme." (Original italics; accord, *People* v. *Jones* (1997) 15 Cal.4th 119, 181 [61 Cal.Rptr.2d 386, 931 P.2d 960].)

Defendant also argues that his trial counsel was incompetent for failing to object to the asserted misconduct. As we stated in *People* v. *Carrera, supra,* 49 Cal.3d at page 320, "The record reveals no explanation for defense counsel's failure to object, and the question would thus be cognizable only on habeas corpus as part of a claim of ineffective assistance of counsel. [Citation.] The matter is not properly before us here. [Fn. omitted.]" (Accord, *People* v. *Jones, supra,* 15 Cal.4th at p. 182 [record does not eliminate possibility of informed tactical choice].) We also observe that, in light of the evidence in this case, it is not reasonably probable that counsel's failure to object to prosecutorial misstatements affected the guilt verdict. (See *People*

v. *Medina, supra,* 51 Cal.3d at p. 895.) We conclude that defendant has waived any claim of prosecutorial misconduct during the closing arguments.

In any event, there is no merit to defendant's claims that the cited remarks constituted misconduct. ▮ Prosecutors have wide latitude to discuss and draw inferences from the evidence at trial. (*People* v. *Lucas* (1995) 12 Cal.4th 415, 473 [48 Cal.Rptr.2d 525, 907 P.2d 373].) Whether the inferences the prosecutor draws are reasonable is for the jury to decide. (*Id.* at p. 474.) Harsh and vivid attacks on the credibility of opposing witnesses are permitted, and counsel can argue from the evidence that a witness's testimony is unsound, unbelievable, or even a patent lie. (*People* v. *Arias* (1996) 13 Cal.4th 92, 162 [51 Cal.Rptr.2d 770, 913 P.2d 980].) Although defendant singles out words and phrases, or at most a few sentences, to demonstrate misconduct, we must view the statements in the context of the argument as a whole. (*People* v. *Lucas, supra,* 12 Cal.4th at p. 475.)

▮ The prosecutor did not suggest to the jury that it unreasonably reject Dr. Benson's testimony. Rather, in arguing expert testimony could be rejected "out of hand," the prosecutor expressly referred the jury to the court's instructions on experts. The prosecutor's comments on Dr. Benson's testimony that defendant censures were no more than vigorous, but fair, argument of the evidentiary reasons for the jury not to give credibility to his opinions. Contrary to defendant's argument, the prosecutor did not suggest the sodium amytal interview was fabricated evidence. Rather, the prosecutor reminded the jury of the limited admission of defendant's interview statements and argued that the drug-assisted interview was not credible. Other comments defendant assigns as misconduct actually reflect that the prosecutor reasonably and understandably argued points and drew evidentiary inferences at odds with defendant's views of the evidence.

In the challenged remarks, the prosecutor did not substantially misstate the facts or go beyond the record. Ultimately, the test for misconduct is whether the prosecutor has employed deceptive or reprehensible methods to persuade either the court or the jury. (*People* v. *Rowland* (1992) 4 Cal.4th 238, 274 [14 Cal.Rptr.2d 377, 841 P.2d 897].) As we observed in *Rowland,* "Although harsh and unbecoming, the challenged remarks constituted reasonable—if hyperbolic and tendentious—inferences from the evidence. There is no reasonable likelihood that the jury understood the words otherwise." (*Id.* at p. 277.) Here, as was true in *Rowland,* the prosecutor's remarks did not amount to deceptive or reprehensible methods of persuasion.

## 7. *Motion for Change of Venue*

▮ Defendant contends the trial court erred in denying his motion for a change of venue. He cites the broadcast, telecast, and print media news

reports that highlighted the crime, his initial arrest and release, and his rearrest the following day. The circumstances of the crime and defendant's temporary release from custody also attracted commentary by columnists. Some media reports of the sensational crimes included purported details that charitably could be described as speculative. The Attorney General acknowledges that defendant's crimes "generated substantial local publicity in the weeks, perhaps several months, after the murders . . . ." However, as the Attorney General also observes, there was little publicity during the years that followed before the case came to trial in 1988.

A change of venue should be granted if the defendant establishes that a fair trial cannot otherwise be had at the time of the motion. (*People* v. *Pride* (1992) 3 Cal.4th 195, 224 [10 Cal.Rptr.2d 636, 833 P.2d 643].) The factors a trial court typically considers are the nature and gravity of·the offense, the size of the community, the status of the defendant and the victim, and the nature and extent of the publicity. (*Ibid.*) "On appeal, the defendant must show that denial of the venue motion was error (i.e., that it was reasonably likely a fair trial could not be had at the time the motion was made) and that the error was prejudicial (i.e., that it was reasonably likely a fair trial was not in fact had)." (*Ibid.*) In this context, "reasonably likely" " 'means something less than "more probable than not" ' and 'something more than merely "possible." ' [Citation.]" (*People* v. *Proctor* (1992) 4 Cal.4th 499, 523 [15 Cal.Rptr.2d 340, 842 P.2d 1100].)

With respect to the first factor, what we have noted before is true here: "The charged offenses were serious and predictably attracted the attention of the media. But, . . . the same could be said of most multiple or capital murders. This factor is not dispositive. [Citation.]" (*People* v. *Pride*, *supra*, 3 Cal.4th at p. 224.) As to the second factor, Santa Clara County had more than 1,400,000 residents and was the fourth largest county in California. The size of Santa Clara County's population suggests that any prejudicial publicity's effect would be diluted or neutralized over time. (See *People* v. *Proctor*, *supra*, 4 Cal.4th at p. 525.) Neither defendant nor Doreen was a prominent member of this large and populous community. Any uniquely heightened features of the case that gave the victims and defendant any prominence in the wake of the crimes, which a change in venue normally attempts to alleviate, would inevitably have become apparent no matter where defendant was tried. (See *People* v. *Webb* (1993) 6 Cal.4th 494, 514-515 [24 Cal.Rptr.2d 779, 862 P.2d 779].)

Although the nature of the murders attracted some sensational publicity, almost all of the media reports were more than three years old when the case came to trial. (See *People* v. *Hernandez* (1988) 47 Cal.3d 315, 334-335 [253

Cal.Rptr. 199, 763 P.2d 1289] [venue change not mandated where bulk of media's coverage of gruesome facts was two years old].) The passage of time weighs heavily against a change of venue. (*People* v. *Pride, supra,* 3 Cal.4th at p. 225; *Odle* v. *Superior Court* (1982) 32 Cal.3d 932, 943 [187 Cal.Rptr. 455, 654 P.2d 225].) Even the passage of several months can dispel the prejudicial effect of pretrial publicity in a large community. (*People* v. *Proctor, supra,* 4 Cal.4th at p. 525.)

As the Attorney General suggests, the passage of time appears to have had the expected effect in this instance. The majority of jurors who remained after excuses for hardship and for cause either had never heard of the case or had only vague and superficial recollections of the reports that immediately followed the crimes. Few prospective jurors apparently had to be excused because they had formed opinions on guilt. When asked, the remaining prospective jurors assured the court they could be fair. Among the regular and alternate jurors, those who said they knew something of the case remembered no specifics and had heard nothing since the original coverage three years earlier. The record does not support a conclusion that defendant could not have had or did not have a fair trial in Santa Clara County.

Furthermore, defendant used only 23 of his 26 allotted peremptory challenges to excuse jurors from the panel. He used only one of his three challenges to excuse alternate jurors. As we have said before, "The failure to exhaust peremptories is a strong indication 'that the jurors were fair, and that the defense itself so concluded.' [Citation.]" (*People* v. *Price, supra,* 1 Cal.4th at p. 393.) This last point can be decisive. (*People* v. *Daniels* (1991) 52 Cal.3d 815, 853-854 [277 Cal.Rptr. 122, 802 P.2d 906].) Here, we view the unused peremptory challenges as further confirmation that the trial court properly denied defendant's motion to change venue.

8. *Evidentiary Issues Concerning Deanna Erbert*

As noted earlier, Deanna Erbert was four years old at the time of the crimes, and eight years old when she testified at trial. Defendant requested and received a pretrial evaluation in camera of Deanna's competency to testify. The court found her competent. Defendant presents two arguments in connection with that determination. First, he argues the trial court erred and that allowing Deanna's testimony violated his Sixth Amendment right to cross-examination and his Eighth and Fourteenth Amendment rights to a reliable death judgment. Second, he claims that his trial counsel was ineffective for not adequately challenging Deanna's capacity to testify or requesting a cautionary instruction.

In a related argument, defendant asserts the admission of two extrajudicial statements by Deanna constituted inadmissible hearsay. He contends his

counsel was incompetent for not objecting to the statements' admission, which he says violated his Sixth Amendment right to confrontation. We consider these issues in turn.

### a. *Competence to Testify*

██ In assessing defendant's challenges to Deanna's competence as a witness, we return to the rules we applied to similar claims in *People* v. *Mincey* (1992) 2 Cal.4th 408, 444 [6 Cal.Rptr.2d 822, 827 P.2d 388]: "As a general rule, 'every person, irrespective of age, is qualified to be a witness and no person is disqualified to testify to any matter.' (Evid. Code, § 700; see Pen. Code, § 1321.) A person may be disqualified as a witness for one of two reasons: (1) the witness is incapable of expressing himself or herself so as to be understood, or (2) the witness is incapable of understanding the duty to tell the truth. (Evid. Code, § 701, subd. (a).) The party challenging the witness bears the burden of proving disqualification, and a trial court's determination will be upheld in the absence of a clear abuse of discretion. [Citation.]"

██ Here, the voir dire questioning of Deanna established her ability to express herself in an understandable manner. The examination also amply established that Deanna understood the difference between truth and falsehood and appreciated that she had to tell the truth. She also understood that she was to testify only as to those matters she knew herself from her memory. Therefore, the trial court did not abuse its discretion in determining that Deanna was competent to testify.

Defendant contends Deanna should have been excluded as a witness because she was not questioned about her personal knowledge of the subject matter of her testimony. ██ However, as the California Law Revision Commission Comment to Evidence Code section 701 states: "[Evidence Code] Section 701 requires the court to determine only the prospective witness' capacity to communicate and [her] understanding of the duty to tell the truth. The missing qualifications—the capacity to perceive and to recollect—are determined in a different manner. Because a witness, qualified under Section 701, must have personal knowledge of the facts to which [she] testifies (Section 702), [she] must, of course, have the capacity to perceive and to recollect those facts. But the court may exclude the testimony of a witness for lack of personal knowledge only if no jury could reasonably find that [she] has such knowledge. [Citations.] Thus, the Evidence Code has made a person's capacity to perceive and to recollect a condition for the admission of [her] testimony concerning a particular matter instead of a condition for [her] competency to be a witness. And, under the Evidence

Code, if there is evidence that the witness has those capacities, the determination whether [she] in fact perceived and does recollect is left to the trier of fact. [Citations.]" (Cal. Law Revision Com. com., 29B pt. 2 West's Ann. Evid. Code (1995 ed.) foll. § 701, p. 284.)

 The voir dire of Deanna showed that she could perceive and recollect, and she understood she should not invent or lie about anything she said in court. She was an eyewitness to the events. Consequently, once the trial court properly determined she was competent to testify under Evidence Code section 701, it had no basis for excluding her testimony for lack of personal knowledge.

The facts that Deanna received therapy to help her cope with her mother's death, that she discussed the events with the prosecutor and others, and that she had gaps in her memories of the evening the crimes occurred, do not disqualify her as a witness. (*People* v. *Mincey, supra*, 2 Cal.4th at pp. 444-445; see *People* v. *Cudjo* (1993) 6 Cal.4th 585, 621-622 [25 Cal.Rptr.2d 390, 863 P.2d 635].) The trier of fact can evaluate these matters, when appropriate and otherwise permissible, in resolving the question of credibility. (*People* v. *Mincey, supra*, 2 Cal.4th at pp. 444-445.)

We also reject defendant's claim that admission of Deanna's testimony violated his Sixth Amendment right to confrontation because of her limited memories of her mother's death. The right of confrontation secures to an accused an adequate opportunity to cross-examine adverse witnesses; it does not guarantee testimony free from forgetfulness, confusion, or even evasion. (*People* v. *Cudjo, supra*, 6 Cal.4th at p. 622.) Also without merit is defendant's claim that Deanna's testimony was unreliable and, because it contributed to a judgment of death, it violated his constitutional rights under the Eighth and Fourteenth Amendments. Defendant was fully afforded the protections of the procedures constitutionally required to ensure reliability in the factfinding process. As we have previously remarked in rejecting essentially the same contention, defendant " 'was given an opportunity to be heard and to cross-examine in a judicial forum.' [Citation.]" (*People* v. *Cudjo, supra*, 6 Cal.4th at p. 623, quoting *People* v. *Mincey, supra*, 2 Cal.4th at p. 445.)

### b. *Competence of Counsel Regarding Deanna's Testimony*

 Defendant asserts his counsel was ineffective for not challenging Deanna's ability to perceive, recall, or recount the events of her mother's death during the voir dire examination. However, the record shows no basis for such a challenge, much less any prospect it would have succeeded.

Instead, Deanna's affirmative responses to the initial inquiries about these matters suggested further questioning by defense counsel may have been counterproductive. Moreover, as the Attorney General observes, defendant's trial counsel might have had a sound tactical reason not to question Deanna in depth: There could be no assurance that further probing would not trigger memories of the killings otherwise unavailable to her.

Defendant also faults his trial counsel for not requesting the instruction provided for in section 1127f.[12] The trial court gave the jury the standard instruction on evaluating witness credibility, which in itself provides adequate general guidance for consideration of a child's testimony. There is no sua sponte duty to instruct the jury concerning a child's testimony. (*People v. Cudjo, supra*, 6 Cal.4th at pp. 623-624.)

As the Attorney General remarks, defense counsel reasonably could decide to forgo the instruction for tactical reasons. The section 1127f instruction informs a jury that a child may "perform differently as a witness from an adult" due to the child's cognitive development level, that a child is not any more or less credible than an adult, and that a child's testimony should not automatically be discounted or distrusted. Defense attorneys have attacked the instruction repeatedly. They have claimed that it invades the jury's function of assessing witness credibility (*People v. Jones* (1992) 10 Cal.App.4th 1566, 1572-1574 [14 Cal.Rptr.2d 9]), unduly inflates children's testimony, and decreases the government's burden of proof (*People v. Gilbert* (1992) 5 Cal.App.4th 1372, 1392-1394 [7 Cal.Rptr.2d 660]), and that it impairs the right to confrontation by undermining impeachment based on a witness's immature performance (*People v. Harlan* (1990) 222 Cal.App.3d 439, 455-457 [271 Cal.Rptr. 653]). Although these attacks failed, they were not so baseless and unreasonable as to render defense counsel's performance deficient for not requesting the instruction in this case. In any event, because the jury received adequate guidance from the standard instruction on credibility, the absence of an instruction pursuant to section 1127f does not undermine our confidence in the trial's outcome.

---

[12]Section 1127f states: "In any criminal trial or proceeding in which a child 10 years of age or younger testifies as a witness, upon the request of a party, the court shall instruct the jury [] as follows: [¶] In evaluating the testimony of a child you should consider all of the factors surrounding the child's testimony, including the age of the child and any evidence regarding the child's level of cognitive development. Although, because of age and level of cognitive development, a child may perform differently as a witness from an adult, that does not mean that a child is any more or less credible a witness than an adult. You should not discount or distrust the testimony of a child solely because he or she is a child."

CALJIC No. 2.20.1 incorporates the mandated instruction and adds a brief explanatory paragraph: " 'Cognitive' means the child's ability to perceive, to understand, to remember, and to communicate any matter about which the child has knowledge."

### c. *Deanna's Extrajudicial Statements*

Defendant contends that Charles Erbert's and Jennie Chapman's testimony about statements Deanna made on the night of the killings violated his Sixth Amendment right of confrontation because they were inadmissible and unreliable hearsay. He also asserts his attorney was incompetent for not objecting to the statements. We conclude the statements were properly admissible. Consequently, although the absence of an objection by defendant's counsel waived the substantive contention, the omission was neither evidence of a deficient performance nor prejudicial.

Charles testified that while he and Deanna waited for the fire department's paramedics to arrive and help Doreen, Deanna told him the man who attacked Doreen said, " 'I'm coming back to kill you. If you tell somebody, I'll kill you. I'm coming for you, too,' " or something similar.

Jennie Chapman, a neighbor of the Erberts, came to the house immediately in response to a call from Charles. She arrived after the paramedics; Deanna was brought out to her. She testified about waiting outside in a car with Deanna: "She would kind of drift off. She'd—she wouldn't say anything. And then she said, he killed my mommy. And I said, who. I can't tell you because he said he'd kill me. He'd come back and get me if I told."

As defendant implicitly recognizes, the statements Deanna attributed to the killer were not offered for their truth; that is, they were not admitted to prove the killer would return to kill Deanna if she told. Rather, they were relevant to the killer's state of mind at the time of the killings. Consequently, defendant's statements to Deanna were not within the hearsay rule. (Evid. Code, § 1200.) Moreover, the hearsay rule does not prevent evidence of a statement made by a party from being admitted against that party. (Evid. Code, § 1220.)

The Attorney General acknowledges that Deanna's statements to Charles and Jennie were admitted for their truth to the extent Deanna attributed the threats to the killer. However, Deanna's statements constituted spontaneous utterances that were excepted from the hearsay rule under Evidence Code section 1240: "Evidence of a statement is not made inadmissible by the hearsay rule if the statement: [¶] (a) Purports to narrate, describe, or explain an act, condition, or event perceived by the declarant; and [¶] (b) Was made spontaneously while the declarant was under the stress of excitement caused by such perception." Unquestionably, Deanna was under the immediate influence of stress from events that caused sufficient nervous excitement to make her statements about the threats spontaneous and unreflecting. (See *People* v. *Poggi, supra,* 45 Cal.3d at pp. 318-320.)

We reject defendant's contention that a statement admissible under Evidence Code section 1240 nevertheless violates Sixth Amendment confrontation rights unless the prosecution shows both declarant unavailability and adequate indicia of reliability. Defendant made no timely or specific objection on this ground in the trial court. Thus, he has not preserved the claim for review. (*People* v. *Alvarez* (1996) 14 Cal.4th 155, 186 [58 Cal.Rptr.2d 385, 926 P.2d 365].) Even if the claim had been preserved, however, it would have no support in the law. The hearsay exception for spontaneous declarations is among those "firmly rooted" exceptions that carry sufficient indicia of reliability to satisfy the Sixth Amendment's confrontation clause. (*White* v. *Illinois* (1992) 502 U.S. 346, 355, fn. 8 [112 S.Ct. 736, 742, 116 L.Ed.2d 848] and accompanying text.) The Sixth Amendment confrontation clause imposes no requirement of declarant unavailability as a prerequisite for admission of spontaneous declarations. (*Id.* at pp. 355-356 [112 S.Ct. at pp. 742-743].) Therefore, admission of Deanna's extrajudicial statements did not violate defendant's confrontation rights. (*People* v. *Alvarez, supra,* 14 Cal.4th at pp. 186-187.)

### 9. *Admissibility of Don Isbell's Statements to the Police*

Don Isbell was a neighbor of the Erberts. He testified he saw a man wearing a wolf mask standing by himself near the Erbert home earlier in the evening of the murders. Isbell had taken his children trick-or-treating in the area with another neighbor and her daughter. As he recalled at trial, he and his children spent 20 to 25 minutes visiting the neighborhood homes, including the Erberts' house. Isbell intended to return home in time for his children to leave for a party at his son's school at 7:00 p.m. Isbell could not remember at trial the exact time he and the others were trick-or-treating, but he had been positive about the timing when he spoke with the police a few days after the crimes.

In cross-examining Isbell, defense counsel asked him about his statements to the police concerning the mask and his description of it. Counsel questioned Isbell about his recollection that the man in the wolf mask wore dark clothing and whether Isbell told that to the police. When Isbell replied he could not remember, counsel had him review a page from the police report that contained statements by him, asking if that refreshed his memory. Isbell again answered he did not recall if he told the police about the clothing.

The prosecutor began her redirect examination by asking Isbell if the police report's statement that he was trick-or-treating sometime between 6:15 p.m. and 6:45 p.m. was correct; he said yes. The prosecutor started to ask Isbell if the report indicates he made other statements to the police;

defense counsel objected that the prosecutor was leading Isbell. The prosecutor responded that she was introducing a prior consistent statement; the trial court overruled the objection.

The prosecutor then asked Isbell if the report indicated he told the police he saw a man in the area who wore a mask similar to that in a photograph he was shown, and that the man was a little shorter than Isbell's height of six feet and three inches. Isbell replied that that was what the police wrote down, but he thought his conversation with the police was longer than the report might indicate. Isbell also said that he gave the police a description of the mask, and that the comparison to the photograph was a police summary, not his statement.

▮ On appeal, defendant contends Isbell's police report statements that the prosecutor read during redirect examination were inadmissible hearsay. He contends the court erred in letting the prosecutor read those statements as prior consistent statements without first laying a sufficient foundation. However, defendant has not preserved this claim for review. His objection at trial was limited to leading questions. ▮ The general rule, which has no exception applicable here, precludes review of questions on admissibility of evidence absent a timely and specific objection in the trial court on the ground urged on appeal. (*People* v. *Alvarez, supra,* 14 Cal.4th at p. 186.) ▮ Moreover, if defendant had objected on foundational grounds, the prosecutor might have been able to cure any problem. In any event, if the claim had been preserved, we would conclude the statements were not unduly prejudicial.

The statement of the time Isbell was trick-or-treating does not appear to have been offered as a prior consistent statement. The prosecutor's reference to that hearsay exception came in response to defendant's objection to a subsequent question. The Attorney General argues the prior statement about time was used to refresh Isbell's recollection. Defense counsel had Isbell review the police report during the immediately preceding cross-examination to see if it refreshed his memory as to the masked man's clothing and what Isbell told the police in that regard. The prosecutor then began her redirect examination by referring to the police report of Isbell's statement of the time period he was trick-or-treating. During his direct examination, Isbell had not been able to recall the exact time, although he said he had been certain when he spoke to the police soon after the killings.

The circumstances here approximate the past recollection recorded exception to the hearsay rule, rather than use of a writing to refresh recollection. (Evid. Code, § 1237.) Isbell had insufficient recollection to testify fully and

accurately concerning the time period when he saw the man in the wolf mask. His statement on the subject was recorded in the police report soon after the event, and he testified he was certain of the time then. (Evid. Code, § 1237; see 3 Witkin, Cal. Evidence (3d ed. 1986) Introduction of Evidence at Trial, § 1836 et seq., pp. 1793-1798.) Although the record does not provide a complete foundation for the statement's admission under Evidence Code section 1237, the comments could have been read into evidence if the proper procedure had been followed. (See *People* v. *Parks* (1971) 4 Cal.3d 955, 960-961 [95 Cal.Rptr. 193, 485 P.2d 257].)

Ultimately, as the Attorney General correctly observes, any error in allowing the statement that Isbell was trick-or-treating between 6:15 p.m. and 6:45 p.m. was manifestly harmless. Isbell himself earlier testified they had to finish and return home in time to leave for the 7:00 p.m. party at his son's school. His son, Matt, also testified about trick-or-treating only a short time because of the party, and he said that he too saw a man in a wolf mask and dark clothes standing alone near the Erberts' home. Matt testified that they left to go trick-or-treating about 6:00 p.m. and that they had to get back around 6:30 p.m. in order to get ready to be at the party at 7:00 p.m. Joann Callender, the neighbor who was with Isbell, testified that they started trick-or-treating around 6:00 p.m. and that she returned home shortly before 7:00 p.m.

Under the circumstances, it is not reasonably probable that exclusion of Isbell's police report statement about the time period involved would have produced a more favorable result for defendant. The undisputed evidence essentially established that Isbell and Callender had concluded trick-or-treating with their children by 7:00 p.m. If Isbell saw defendant wearing a wolf mask and standing alone near the Erberts' home, evidence other than the police report statement overwhelmingly established that it must have happened hours before the killings. Thus, similar, unchallenged evidence necessarily relegated the challenged statement to a minor, cumulative role, if any, in the jury's deliberations. (See *People* v. *Noguera* (1992) 4 Cal.4th 599, 627-628 [15 Cal.Rptr.2d 400, 842 P.2d 1160].)

The prosecutor's reference to the police report's account that Isbell recollected seeing a man in a wolf mask similar to the photograph was neither objectionable nor unduly prejudicial. Defense counsel's cross-examination attacked Isbell's credibility by implying that he fabricated the details of his description of the wolf mask after his recent interview with the district attorney's investigator, who showed him pictures of the mask. Defense counsel's questioning also implied other details of Isbell's testimony about the man in the mask were new and not told to the police. Therefore, both the

prosecutor's reference to Isbell's prior statements in the police report, and her questioning Isbell about what he told the police, were appropriate and admissible. (Evid. Code, § 791; see *People* v. *Noguera, supra,* 4 Cal.4th at pp. 629-630.)

Furthermore, the admission of Isbell's prior statements could not have unfairly prejudiced defendant. Here again, the challenged statements were a brief and cumulative reiteration of evidence provided in Isbell's direct examination and corroborated by others. As noted earlier, Isbell's son, Matt, testified to seeing the man in the mask standing alone near the Erberts' home hours before the murders. Manuel Gonzalez also testified that he saw defendant, without a mask, leaning on a car near the Erberts' home around 6:30 p.m. to 7:00 p.m. that evening. There is no reasonable probability that exclusion of Isbell's brief statements in the police report would have enabled defendant to obtain a more favorable outcome.

Defendant also contends he was denied effective assistance of counsel because trial counsel did not object on hearsay grounds to admission of Isbell's statements to the police. He further contends the admission of these statements denied him a reliable guilt determination in violation of the Eighth Amendment. Both contentions are meritless for the same reasons that the statements were properly allowed and were not unduly prejudicial. We also observe that defendant's counsel may have had a reasonable tactical reason not to object. An objection might only have prompted the prosecutor to establish a fuller foundation for admitting the statements, thus strengthening the witness's credibility.

### 10. *Other Jury Instruction Issues*

Defendant raises several issues concerning jury instructions. He argues the trial court erred in giving CALJIC No. 2.10 regarding medical expert witness testimony about statements the defendant made during an examination. Defendant also contends that CALJIC No. 17.10, together with the prosecutor's closing argument, impermissibly restricted the jury's deliberations solely to the capital offense. He claims the lack of a cautionary instruction on the use of juror notes is reversible error. Defendant also contends his absence from the jury instruction conference violated his constitutional rights under the Fifth, Sixth, and Fourteenth Amendments. We discuss each of these claims below and conclude they have no merit.

#### a. *CALJIC No. 2.10*

At the prosecutor's request, the trial court's jury instructions included CALJIC No. 2.10 (4th ed. 1979 bound vol.): "There has been

admitted in evidence the testimony of a medical expert of statements made to him by the defendant in the course of an examination of the defendant which was made for the purpose of diagnosis. The testimony of such statements may be considered by you only for the limited purpose of showing the information upon which the medical expert based his opinion. Such testimony is not to be considered by you as evidence of the truth of the facts disclosed by defendant's statements."

Defendant contends that giving this instruction was error with respect to Dr. Benson's testimony, although defendant concedes the court properly could have limited the use of that testimony in accordance with the instruction. However, he argues that the court's omission of the instruction until the end of trial, without previously limiting the jury's consideration of the testimony or alerting defense counsel and defendant to this limited use, denied him a fair trial as guaranteed by the Eighth and Fourteenth Amendments. Defendant asserts that because both sides had rested before the prosecutor requested the instruction, his "trial counsel had no doubt relied on the full admissibility of Dr. Benson's testimony in choosing to have appellant waive his right to testify at the guilt phase." Thus, in defendant's view, "[b]y restricting the testimony of Dr. Benson after the close of evidence, the court instructed the jury to ignore [defendant's] only opportunity to present his version of the facts of the killings."

Defendant's arguments in this regard derive from a misconception of the import of statements the prosecutor made to the court when Dr. Benson began to testify about his interviews of defendant: "Your Honor, I would ask specifically that anything that the doctor says in terms of any interview or technique that he used is being offered not for the truth of the matter that is asserted in the interview, whether it was chemically assisted or not, but merely that the words were spoken, that somehow those words affected the doctor's opinion and that the content is not true as to those words and that the jury be so instructed." The court responded: "Objection overruled." Defendant's counsel said nothing.

Defendant characterizes this exchange simply as the prosecutor's hearsay objection that the trial court overruled. He therefore argues that defendant's statements, to which Dr. Benson testified, were admitted for the truth of the statements. Defendant concludes that he was entitled to rely on this ruling. However, as the Attorney General argues, the prosecutor's objection, fairly read, included a request for a limiting instruction during trial.

Evidence Code section 355 requires the court to give appropriate limiting instructions if properly requested. However, the timing of these

instructions is in the trial court's discretion. (*People* v. *Johnson* (1967) 253 Cal.App.2d 396, 399 [61 Cal.Rptr. 225]; see § 1093, subd. (f).) Thus, the trial court is not obliged to give limiting instructions the moment they are requested or when the limited evidence is presented; subsequent instruction can be sufficient in a proper case. (*People* v. *Johnson, supra,* 253 Cal.App.2d at pp. 399-400.) ▮ Consequently, the trial court's ruling in this case on the prosecutor's objection and midtrial request for a limiting instruction would not have precluded a later request for instruction under CALJIC No. 2.10. The propriety of the instruction was manifest, inasmuch as defendant could not offer his own hearsay statements as evidence of the truth of what he told Dr. Benson. (See *People* v. *Clay* (1984) 153 Cal.App.3d 433, 457 [200 Cal.Rptr. 269]; *People* v. *Williamson* (1977) 71 Cal.App.3d 206, 213-214 [139 Cal.Rptr. 222].)

We see no merit in defendant's assertion of surprise and prejudice from the trial court's decision to give CALJIC No. 2.10 after the defense and prosecution had rested. Defendant argues this action amounted to "changing the rules" and that it deprived the jury of his version of the killings. However, there was no change in the rule against a party's offering his own hearsay statements for the truth of the matters stated; defendant's statements to Dr. Benson always were inadmissible for that purpose. Moreover, the thrust of Dr. Benson's opinion testimony was that defendant's claimed impaired ability to perceive, comprehend, or relate the events surrounding the killings evidenced mental disease. As the Attorney General observes, there is no reason to believe defendant would have tried to testify to those events, and subjected himself to cross-examination concerning them, had the hearsay rule's familiar limitations on Dr. Benson's testimony been formally announced earlier.

▮ Furthermore, the long-established general rule is that a claim of unfair surprise at trial may not be raised for the first time after the verdict. (*People* v. *Toro* (1989) 47 Cal.3d 966, 975-976 [254 Cal.Rptr. 811, 766 P.2d 577].) The rule applies generally to criminal cases and prevents counsel from speculating on a favorable verdict once a situation arises that might constitute legal surprise. (*Id.* at p. 976.) Counsel must act at the earliest possible moment after discovering the surprise, because counsel waives the ground by failing to make it known to the court through a motion for mistrial or for a continuance. (*Ibid.*) ▮ Here, defendant took none of the steps expected of a party who desires to claim unfair surprise, nor did he ask to reopen his case.

Although section 1259 allows us to review—even in the absence of an objection—instructional error that affects substantial rights, the trial court's

decision to give CALJIC No. 2.10 was not erroneous in any of the usual senses of being legally incorrect, misleading, or unrelated to the facts of the case. (Cf. *People* v. *Toro, supra,* 47 Cal.3d at p. 977.) Under the circumstances of this case, only defendant could have known whether giving CALJIC No. 2.10 would affect any substantial right of his to testify. As a result, although a failure to object does not bar review of the instruction, it does bar a contention based on unfair surprise. (*People* v. *Toro, supra,* 47 Cal.3d at p. 977.)[13]

Defendant also argues that the prosecutor ignored her own requested instruction. He contends that the prosecutor referred, in cross-examination of Dr. Benson and in closing argument, to defendant's statements to Dr. Benson as if they had been admitted for the truth of the matters he stated. Defendant's counsel never objected to this claimed impropriety, and so defendant waived any claim in that regard. (See *People* v. *Carpenter, supra,* 15 Cal.4th at p. 413.)

In any event, defendant's contention lacks support in the record. Defendant refers to transcript pages setting out the prosecutor's arguments based on inferences she drew from testimony and evidence other than defendant's statements to Dr. Benson. Defendant also refers to part of the prosecutor's argument that Dr. Benson's diagnosis was not credible in light of defendant's statements and the rest of the evidence available to the doctor.[14] The prosecutor specifically told the jury the doctor's account of defendant's statements was offered not for their truth, but for assessing the premises and credibility of the doctor's diagnosis. The prosecutor argued that to the extent she relied on these matters, the facts had independent proof. No basis exists for claiming the prosecutor ignored her requested instruction or argued defendant's statements to Dr. Benson were true.

### b. *CALJIC No. 17.10*

■ The trial court gave the jury CALJIC No. 17.10 (1984 rev.): "If the jury is not satisfied beyond a reasonable doubt that the defendant is guilty of

[13]There is no support in the record for the claim that defendant's trial counsel felt unfairly surprised by the prosecution's request for CALJIC No. 2.10 or the trial court's decision to grant the request. Once counsel accepted the prosecutor's representation that she had objected earlier—an objection she noted had been overruled—and obtained the court's ruling that only an unmodified version of the form instruction would be used, counsel had no further objections to the instruction.

[14]The same conclusions apply to defendant's claim that the prosecutor used hearsay from others to argue that defendant knew Doreen was pregnant. The statements, contained in reports Dr. Benson reviewed, indicated that both defendant's stepmother and brother knew Doreen was pregnant. In cross-examining Dr. Benson, the prosecutor referred to those statements to question the credibility of the doctor's acceptance of defendant's claim to him that he did not know Doreen was pregnant until the fetus was expelled.

the offense charged and it unanimously so finds, it may convict him of any lesser offense, if the jury is convinced beyond a reasonable doubt that he is guilty of such lesser offense. [¶] The offense of voluntary manslaughter is a lesser offense to the offense charged in Count One." Defendant argues this instruction, in conjunction with the prosecutor's argument, channeled deliberations away from noncapital offenses if even one juror voted for first degree murder.[15] In defendant's view, the instruction and argument precluded jury deliberation of voluntary manslaughter by suggesting a verdict of not guilty of murder was a prerequisite to considering manslaughter.

We have held that a court may restrict a jury from returning a verdict on a lesser included offense before acquitting on a greater offense, but may not preclude it from considering lesser offenses during deliberations. (*People* v. *Berryman, supra*, 6 Cal.4th at p. 1073; *People* v. *Kurtzman* (1988) 46 Cal.3d 322, 324-325 [250 Cal.Rptr. 244, 758 P.2d 572].) Thus, a trial court should not tell the jury it must first unanimously acquit the defendant of the greater offense before deliberating on or even considering a lesser offense. (*People* v. *Kurtzman, supra*, 46 Cal.3d at pp. 328, 335.)

Contrary to defendant's assertion, neither the jury instruction nor the prosecutor's argument—separately or in combination—precluded the jury from considering voluntary manslaughter during their deliberations on Doreen's killing. Plainly, the prosecutor did not tell the jury it could not or should not consider a lesser offense unless it first acquitted of the greater offense. Instead, the prosecutor did no more than offer the jury a suggested approach to its formal decisionmaking and completion of the verdict forms.

---

[15]Defendant refers to the italicized portion of the following excerpt of the prosecutor's closing argument: "When you make the special circumstance finding, that's the last thing you do. That's the thing you do after you have decided which type of murder it is as to each victim. [¶] So you don't sort of say, well, look, we're all going to agree one's a first degree, one is either a first or second, and therefore the special circumstance is true. First you decide about the murders, and then you just look at it logically. You have got two murders, one of which is of the first degree, then the special circumstance is true. [¶] Now, I think it's important that you understand that when you approach these cases, that if for instance, you all agree, yes, there was malice, yes, this is murder, so we all know that at least it is a second degree, don't write anything down. Don't fill out a verdict form. Because once you say whatever it is, once you sign that verdict form, that's what it is. [¶] So the better approach may be, I suggest, that first you look and you say as to Doreen, was there premeditation? Was there deliberation? Was there intent to kill? If your decision on each of those three is yes, then it's first degree murder. Go no further, because you're not in the business of trading off. You're not horse trading here. You're twelve people making individual decisions. [¶] Then *you do the same thing with the fetus. Because if you reach a lesser point in deciding to be true and use that as your—supposedly for your foundation, once you have reached that lesser point, that's it. You don't have the opportunity of addressing the greater crime. [¶] So it's like the Russian deals [sic]. Look at the big ones first. If you are agreed that it is there, you stop. If you are agreed that it is not there, all twelve of you, then go to the next decision point.*" (Italics added.) Defendant's counsel did not object to the prosecutor's comments.

Similarly, a reasonable juror would have understood the instruction, which the court told the jury to consider in context and with the other instructions as a whole, as governing how to return the verdicts and findings after completing deliberations. Other instructions implicitly told the jury that its deliberations should include consideration of the lesser offenses. For example, the court told the jurors they must give the defendant the benefit of any reasonable doubt they might have if they were deciding between manslaughter and murder or first and second degree murder. (CALJIC Nos. 8.71, 8.72.) No reasonable likelihood exists the jury construed the challenged instruction in a manner contrary to the rule of *People* v. *Kurtzman, supra*, 46 Cal.3d 322. (See *People* v. *Berryman, supra*, 6 Cal.4th at p. 1077.)

Consequently, we find no merit to defendant's contention the jury's deliberations were channeled improperly toward a capital conviction to the exclusion of lesser offenses. The challenged instruction and prosecutor's comments did not impermissibly enhance the risk of an unwarranted capital conviction. Therefore, we find no support for defendant's claims that his rights under the Fifth, Eighth, and Fourteenth Amendments were violated.

Defendant also contends he was denied effective assistance of counsel because his attorney expressly decided to forgo a request for CALJIC No. 8.75.[16] The claim must fail because defendant's counsel reasonably could conclude that forgoing CALJIC No. 8.75 was a sound tactical choice. As we observed in *Kurtzman*, the version of CALJIC No. 8.75 then in use had the potential to confuse jurors on how deliberations should proceed and might create ambiguity as to what was prohibited and what was required. (*People* v. *Kurtzman, supra*, 46 Cal.3d at p. 336.) We also there noted that the wording of CALJIC No. 17.10 was less likely to be misunderstood. (*People* v. *Kurtzman, supra*, 46 Cal.3d at pp. 335-336.) To the extent defendant argues his counsel should have foreseen, and requested, CALJIC No. 8.75 as revised in 1989 after *Kurtzman*, the constitutional standard for effective assistance of counsel has never required such prescience. In any event, it is not reasonably likely the jury construed or applied the instructions in a manner that precluded its consideration of lesser included offenses. (See *People* v. *Berryman, supra*, 6 Cal.4th at pp. 1077-1078, fn. 7 and accompanying text.) Therefore, the absence of CALJIC No. 8.75, either in its prior form or in the revised version, did not prejudice defendant.

c. *Instruction on Jurors' Notes*

 The court permitted the jurors to take notes during the guilt and penalty phases of the trial. The trial court twice gave the jurors essentially

---

[16]As defendant's counsel recognized, our review of *People* v. *Kurtzman, supra*, 46 Cal.3d 322, involved CALJIC No. 8.75 as well as CALJIC No. 17.10. Our decision in *Kurtzman* was released nine days after the jury instruction conference. However, as noted already, the instructions given were entirely consistent with our decision in that case.

the same cautionary instruction regarding the use of notes. At the conclusion of trial, the court instructed the jurors that their notes "are your own personal notes and not for the use of any other juror," and that if a juror's notes and memory differ, "the reporter's notes must prevail."

Defendant claims the instruction was insufficient. He asserts the court also should have instructed the jurors not to permit their notetaking to distract them from the trial proceedings, advised them to use their notes only as an aid to their memories, and admonished them not to be influenced by other jurors' notetaking. (See *People* v. *Whitt* (1984) 36 Cal.3d 724, 747 [205 Cal.Rptr. 810, 685 P.2d 1161] [recommended cautionary instruction]; CALJIC No. 1.05 [same].)

Defendant failed to request a more complete instruction and therefore waived the point for appeal. The trial court has no sua sponte duty to give an instruction regarding use of jurors' notes. (E.g., *People* v. *Mayfield* (1993) 5 Cal.4th 142, 180 [19 Cal.Rptr.2d 836, 852 P.2d 331], and cases cited.)

### d. *Absence From the Instructions Conference*

■ Defendant contends he was improperly denied the right to be personally present at the conference held to frame appropriate guilt phase instructions after the parties had rested their cases. Although defendant did not ask to be personally present, neither did he expressly waive his right to attend the conference.

In general, "the defendant's absence from various court proceedings, 'even without waiver, may be declared nonprejudicial in situations where his presence does not bear a "reasonably substantial relation to the fullness of his opportunity to defend against the charge."' [Citations.]" (*People* v. *Johnson, supra,* 6 Cal.4th at p. 18, and cases cited, italics omitted.) Moreover, "Defendant is not entitled to be present either in chambers or at bench discussions on questions of law" because his presence on these occasions does not bear a reasonable relation to his ability to defend against the charges. (*People* v. *Morris* (1991) 53 Cal.3d 152, 210 [279 Cal.Rptr. 720, 807 P.2d 949]; see also *People* v. *Hardy* (1992) 2 Cal.4th 86, 178 [5 Cal.Rptr.2d 796, 825 P.2d 781].)

We find it unlikely that defendant, a layperson, would have contributed in any way to the discussions regarding appropriate instructions on issues of law. Defendant stresses the importance of the court's ruling limiting Dr. Benson's testimony through the language of CALJIC No. 2.10, as previously discussed, and he suggests he might have "insist[ed] that his version [of

events surrounding the murders] be admitted before the jury." As in *People v. Johnson, supra,* 6 Cal.4th at page 19, "The point seems unduly speculative . . . ."

### 11. *Victim Photographs*

■ Defendant contends the court erred in admitting at the guilt phase, over objection, photographs of victim Doreen Erbert and her family. One photo showed Doreen by herself; another depicted her with some family members. The prosecutor offered the photographs to help confirm the visibility of Doreen's pregnancy before her death. Defense counsel objected, remarking that Doreen was "obviously very pregnant" when murdered, and suggested the prosecutor was attempting to prejudice the jury with sympathetic photos of the victim.

Defendant now concedes that the individual photo was "marginally relevant" on the issue of his knowledge of Doreen's pregnancy. He maintains, however, that the group photo should have been excluded because it was irrelevant and potentially prejudicial. We have examined the photographs, and we reject defendant's contention. Both photographs could have helped the jury assess the obviousness of the victim's pregnancy near the time of her death. Moreover, neither photograph was of such a nature as to be "likely to produce a prejudicial impact" on the jury. (*People* v. *Hovey* (1988) 44 Cal.3d 543, 571 [244 Cal.Rptr. 121, 749 P.2d 776]; see *People* v. *Anderson* (1990) 52 Cal.3d 453, 474-475 [276 Cal.Rptr. 356, 801 P.2d 1107] [photograph of victim and her daughter].)

### 12. *Questioning the Jury Without Counsel Present*

■ Defendant asserts the court erred in questioning the jury at the close of the second day of its guilt phase deliberations, and outside the presence of defendant or his counsel, regarding its numerical division as to count 2, involving the murder of the fetus. (By this time, the jury had reached its unannounced verdict as to count 1, murder of Doreen Erbert, although the record is unclear whether the court was aware of this fact.) During deliberations that morning, the jury requested that Deanna's testimony be read back to them, along with Dr. Hauser's direct testimony concerning the fetus and his entire cross-examination. The jury had also asked to see the machete, which the prosecution suggested was the same as the murder weapon.

At the end of the day, the court explained that it wanted to know whether there had been a vote on count 2 so that it might keep track of the deliberations. The court said it did not want anyone to feel the question was

intended to be coercive in any way. The court also said that, in asking generally how the vote was divided numerically, it was not interested in learning whether the jury was leaning toward a guilty or not guilty verdict. The foreman responded that the jury's vote was 10 to 2. The jury then answered affirmatively when the court inquired whether all of the jurors were willing to return the next day for further deliberations.

Defendant first maintains the court's question improperly "coerced" the jurors and violated his due process rights. However, we have approved the practice of making such inquiries to assist the court in discharging its obligation to assure a verdict is rendered in the case. (See, e.g., *People* v. *Proctor, supra,* 4 Cal.4th at p. 538; *People* v. *Carter* (1968) 68 Cal.2d 810, 815 [69 Cal.Rptr. 297, 442 P.2d 353].) Contrary to defendant's claim, the cases do not require that the jury first indicate a possible deadlock before the court may inquire as to its division. The court has wide discretion to determine whether the jury has had enough time to deliberate and may be unable to reach a verdict. (*People* v. *Price, supra,* 1 Cal.4th at p. 467.) Nor does the court's focus on count 2 seem coercive or even unduly intrusive. The court may well have known that the jury had reached a verdict on count 1, and thus had no reason to inquire regarding that count. The jury's request for a readback of Dr. Hauser's testimony concerning the fetus certainly suggested that the jury had turned its attention to count 2 at that point.

Defendant also contends the court erred in questioning the jury in the absence of defendant or his counsel. (See *People* v. *Hawthorne* (1992) 4 Cal.4th 43, 69 [14 Cal.Rptr.2d 133, 841 P.2d 118] [proscribing communications between judge and jury during deliberations if outside presence of accused and his counsel].) Here, the court did not direct the jury on questions of law or evidence, but merely inquired about its numerical division. Defendant could not possibly have been prejudiced by the procedure. (See *People* v. *Wash* (1993) 6 Cal.4th 215, 249-250 [24 Cal.Rptr.2d 421, 861 P.2d 1107].)

### 13. *Other Claims of Ineffective Assistance of Counsel*

Defendant raises an array of claims of ineffective assistance of counsel. The standards applicable to these claims are familiar. Establishing a claim of ineffective assistance of counsel requires the defendant to demonstrate (1) counsel's performance was deficient in that it fell below an objective standard of reasonableness under prevailing professional norms, and (2) counsel's deficient representation prejudiced the defendant, i.e., there is a "reasonable probability" that, but for counsel's failings, defendant would have obtained a more favorable result. (*Strickland* v. *Washington*

(1984) 466 U.S. 668, 687, 694 [104 S.Ct. 2052, 2064, 2068, 80 L.Ed.2d 674]; *In re Wilson* (1992) 3 Cal.4th 945, 950 [13 Cal.Rptr.2d 269, 838 P.2d 1222].) A "reasonable probability" is one that is enough to undermine confidence in the outcome. (*Strickland* v. *Washington, supra,* 466 U.S. at p. 694 [104 S.Ct. at p. 2068]; *In re Jones* (1996) 13 Cal.4th 552, 561 [54 Cal.Rptr.2d 52, 917 P.2d 1175].)

Our review is deferential; we make every effort to avoid the distorting effects of hindsight and to evaluate counsel's conduct from counsel's perspective at the time. (*In re Jones, supra,* 13 Cal.4th at p. 561.) A court must indulge a strong presumption that counsel's acts were within the wide range of reasonable professional assistance. (*Strickland* v. *Washington, supra,* 466 U.S. at p. 689 [104 S.Ct. at p. 2065].) Thus, a defendant must overcome the presumption that the challenged action might be considered sound trial strategy under the circumstances. (*Ibid.*) Nevertheless, deference is not abdication; it cannot shield counsel's performance from meaningful scrutiny or automatically validate challenged acts and omissions. (*In re Jones, supra,* 13 Cal.4th at pp. 561-562.)

 Defendant first argues that the "single most egregious deficiency" was that trial counsel was unfamiliar with the law of fetal homicide. In particular, defendant attacks his counsel's apparent lack of knowledge that fetal homicides were limited to murder and that manslaughter was not available as a lesser included offense. The record suggests that both the trial court and defendant's counsel initially did not realize the manslaughter instructions could apply only to Doreen's death and not to the fetus's. However, the only prejudice defendant attributes to this situation is counsel's failure to request a lesser included offense instruction under section 12022.9. That omission does not amount to deficient performance because, as discussed earlier, defendant was not entitled to such an instruction in any event. Therefore, this claim of ineffective assistance of counsel must fail.

Defendant also repeats his claim of prosecutorial misconduct in the cross-examination of Dr. Benson, asserting that his counsel was ineffective for not objecting to the prosecutor's questioning. This claim of ineffective assistance of counsel fails because, as we previously found, the prosecutor's cross-examination of the defense's psychiatric expert witness did not constitute misconduct.

Defendant next asserts that his counsel was ineffective for not meaningfully pursuing the change of venue motion. However, defendant has demonstrated no prejudice resulting from this claimed deficiency. As we concluded in reviewing the trial court's ruling on the motion, the record does not

support a finding that defendant could not have had, or did not have, a fair trial in Santa Clara County.[17]

In a related claim, defendant contends his counsel conducted ineffective voir dire of the jury. He argues his counsel should not have allowed the case summary attached to the juror questionnaires to refer to the killings as "these two murders." However, a reasonable juror would have understood the summary to be referring to the crimes with which defendant was charged. This reference was not objectionable, particularly when the jury was instructed that the charge is not evidence and that the defendant was presumed to be innocent. Defendant also argues his counsel should have questioned potential jurors more extensively about mental defenses and that his not doing so indicated a lack of preparation. However, counsel had available some information on the jurors' experiences with, and attitudes towards psychiatry, psychologists, and the mental states required for murder. Moreover, as the Attorney General observes, such an examination would have been inconsistent with counsel's apparent strategic decision to keep open the option of asserting the evidence failed to establish defendant was the killer. Defendant thus fails to establish that this aspect of voir dire resulted from other than an informed strategic decision. (See *People* v. *Freeman* (1994) 8 Cal.4th 450, 485-486 [34 Cal.Rptr.2d 558, 882 P.2d 249, 31 A.L.R.5th 888].)

Defendant contends his counsel's performance was prejudicially deficient because his questions to some witnesses resulted in allegedly damaging testimony. Defendant asserts his counsel needlessly elicited harmful testimony from Charles Erbert, Joseph Escobar, Karen Hitchens, and Deanna Erbert. The contention is meritless.

Counsel's questioning of Charles Erbert, and Erbert's answers, only made clearer Erbert's ill-will toward and probable bias against defendant. Other questions plainly were directed towards establishing the confusion of the crime scene after the paramedics and police arrived. Such evidence might have countered the prosecutor's argument that the positions of the victims' bodies demonstrated both killings were methodical and deliberate. In any event, there is no reasonable probability defendant would have obtained a more favorable result in the absence of the challenged answers by Charles Erbert.

---

[17]Similarly, there is no merit to defendant's claim that his counsel was obliged to have the court poll the jurors, when they were about to be sworn, concerning an article on the case in an unspecified morning paper. Absent a contrary indication in the record, we assume the jury had followed its often-repeated instruction to avoid all publicity about the case. (*People* v. *Pride*, *supra*, 3 Cal.4th at p. 226.) Mere speculation or conjecture that some impropriety might have occurred would be insufficient to require the court to inquire into the matter. (*Ibid.*)

Defendant complains his counsel elicited from Escobar, an old friend of defendant's, his opinion that defendant was a conservative person, not a wild person who abused alcohol or drugs. Defendant contends this questioning was incompetent because it allowed cross-examination concerning defendant's casual drug use and his log of the women with whom he had sexual relations. As the Attorney General notes, however, these matters did not cause Escobar to recant his opinion of defendant. The jury already knew about defendant's casual drug use and his sexual partners log because Dr. Benson had considered them in forming his opinion of defendant's mental state. We cannot conclude counsel was incompetent for eliciting a positive view of defendant simply because the prosecutor could cross-examine the witness regarding negative information already known to the jury.

We discern no prejudice resulting from the claimed incompetent cross-examination of Karen Hitchens, Doreen's sister. In a cursory manner, defendant faults his counsel's reference to Paul's death having been a tragic experience for everyone, and that Paul had been her "little special nephew." Her answers, however, could have implicitly reinforced in the jurors' minds the impact of Paul's death on defendant, which was counsel's objective. The other comments that defendant criticizes, innocuous questions about the circumstances in which the last photographs were taken of Doreen, could not possibly have prejudiced defendant in any cognizable manner.

In addition to his claims of incompetence concerning Deanna's testimony, defendant also faults counsel for his cross-examination of Deanna. He contends counsel "engaged Deanna in a series of questions which served only to highlight the tragedy of the little girl's life." To the contrary, we agree with the Attorney General's assessment. The two and one-half pages of transcript reflect a cross-examination that was entirely innocuous and could not possibly have affected the outcome.

Defendant's next ineffective assistance of counsel claims pertain to the lack of objection to two items of evidence. Defendant contends that counsel should have objected to two photographs of Deanna's bedroom as being irrelevant, and that their admission was erroneous and prejudicial. The contention fails. As the Attorney General suggests, the photographs may have had some marginal relevance at that early stage of the trial, for they showed the house was not ransacked in a manner suggestive of a murder in the course of a burglary or robbery. The absence of such evidence would tend to focus more attention on a suspect with defendant's motive. In any event, the photographs were neither inflammatory nor prejudicial.

Defendant also contends his counsel should have objected that evidence he had a loaded gun in his room was irrelevant. To the contrary, the fact that

defendant had a choice of weapons, yet decided to hack his victims to death, is relevant to show his intent to kill, and to kill cruelly, after premeditation and deliberation.

Defendant faults his counsel for not preventing the cross-examination of his character witness, Joseph Escobar, concerning defendant's written log of the women with whom he had sexual contact, which included, among other things, his ratings of those women. However, defendant was not entitled to elicit testimony from Escobar to suggest he had a conservative character, and at the same time preclude the prosecution from asking about conduct that suggests the contrary. (*People* v. *Payton* (1992) 3 Cal.4th 1050, 1066 [13 Cal.Rptr.2d 526, 839 P.2d 1035].) Defendant also blames his counsel for allowing the prosecutor to use the so-called "little black book" in her guilt phase closing argument. However, the argument was an appropriate challenge to Dr. Benson's testimony, particularly since the log was among the materials the doctor reviewed. The argument suggested that defendant's recordkeeping bore out his view of himself as a modern, sophisticated man, rather than an emotionally frail person who was unable to cope with the failure of his marriage and who was completely devastated by Paul's death.

Defendant also claims his counsel was incompetent for mentioning, during his penalty phase opening statement, that he intended to call as a witness a woman who was mentioned in the log and was aware she was included. Defendant argues that because counsel ultimately did not call the woman as a witness, the jury must have inferred that she refused to testify on defendant's behalf once she became aware of her place in the log. However, the statement itself would negate such an inference. Counsel said the woman knew about the log and her place in it; presumably she was willing to testify nonetheless. We find counsel's statement could not have prejudiced defendant.

We turn next to defendant's contention that his counsel failed to present a meaningful closing argument at the guilt or penalty phase. ■■ As we have said before, "The effectiveness of an advocate's oral presentation is difficult to judge accurately from a written transcript, and the length of an argument is not a sound measure of its quality." (*People* v. *Cudjo, supra,* 6 Cal.4th at pp. 634-635.) Though an argument reproduced in a written transcript may appear to lack clarity or eloquence, that will not establish it fell below the standard for reasonably competent representation, or show a reasonable probability that a better presentation would have produced a more favorable penalty verdict. (*Id.* at p. 635.)

Here, defendant's criticisms of his counsel's closing arguments amount merely to disagreements about matters of style and technique. We find no

fault with counsel's employment of a humble and respectful tone that acknowledged the jury's ultimate responsibility for defendant's fate. We have reviewed both closing arguments counsel made on defendant's behalf. We are not persuaded they failed to satisfy the standard of reasonably competent representation. Furthermore, defendant fails to show that "better" presentations could have created a reasonable probability of a more favorable verdict in either the guilt or penalty phases.

## B. Penalty Phase

### 1. Jury Issues

#### a. Juror Dismissed for Death Penalty Opposition

Defendant contends the court erred in excusing prospective juror Barra Kover for cause because of her opposition to the death penalty. Before individualized voir dire, the prospective jurors completed a questionnaire that inquired about their views on the death penalty. Barra Kover answered "yes" to a question asking whether her views would impair her ability to decide the case, stating that she was "*opposed* to the death penalty strongly . . . . [E]ven a 1 [percent] doubt [as to guilt] would not be sufficient in my mind to put a person to death . . . ." Later the court examined Barra Kover, and she confirmed that she would not vote for death in any circumstances and "would not favor it." On the basis of these responses, the court excused her, and defendant did not object.

Defendant contends that Barra Kover's responses were insufficient to justify excusing her, but the controlling rule is otherwise. The trial court has wide latitude in appraising ambiguous or conflicting responses regarding the death penalty views of prospective jurors; we will uphold a determination to excuse the juror when, as here, it is based on substantial evidence. (E.g., *People* v. *Hill* (1992) 3 Cal.4th 959, 1003-1005 [13 Cal.Rptr.2d 475, 839 P.2d 984].) The juror's responses made it plain that her views on the death penalty would substantially impair her performance of her duties as a juror in accordance with her oath. (*People* v. *Holt* (1997) 15 Cal.4th 619, 651-652 [63 Cal.Rptr.2d 782, 937 P.2d 213].) Defendant's further contention that the court erred by not explaining reasonable doubt to her finds no support in the case law. Defendant fails to elucidate how such a discourse would have assisted the defense in this case.

#### b. Failure to Rehabilitate Prospective Jurors

In a related argument, defendant argues his counsel was ineffective for not attempting to rehabilitate six jurors who were excused for their

opposition to the death penalty. During voir dire, these prospective jurors made clear their opposition to the death penalty. Defendant contends their questionnaires had conflicting or equivocal answers to the questions concerning the death penalty. However, defendant fails to identify what, if anything, in these jurors' questionnaires suggested they were not firmly opposed to the imposition of the death penalty under any circumstances. Defendant's failure to develop this claim in any meaningful manner justifies its rejection. (*People* v. *Cain* (1995) 10 Cal.4th 1, 43, fn. 17 [40 Cal.Rptr.2d 481, 892 P.2d 1224].) In any event, our review of the voir dire of these prospective jurors provides absolutely no indication their views on the death penalty were malleable. Therefore, defendant's counsel was not ineffective for not conducting a futile attempt to qualify them for the jury. Moreover, trial counsel's decisions concerning attempts to rehabilitate prospective jurors are inherently tactical.

### c. *Failure to Seek Stipulation for Separate Juries*

■ Defendant contends his counsel was ineffective for not pursuing a stipulation to impanel separate juries for the guilt and penalty phases. He bases the contention on nothing more than the trial court's conversational recollection of an occasion when counsel in a prior case had stipulated to that procedure with the court's approval. In context, the trial court's remarks reflect only an effort to probe the depth of one prospective juror's feelings about the death penalty. The court noted that in the earlier case, a juror who initially opposed the death penalty, and who was to sit only for the guilt phase, changed her mind after hearing the evidence. Nothing in the record suggests the trial court intended its remarks to prompt resort to that procedure in this case.

Although there is a strong legislative preference for use of a single jury, separate guilt and penalty phase juries can be used if the parties agree and the trial court finds good cause to order that procedure. (*People* v. *Carpenter*, *supra*, 15 Cal.4th at pp. 371-372, fn. 3; *People* v. *Beardslee* (1991) 53 Cal.3d 68, 102 [279 Cal.Rptr. 276, 806 P.2d 1311].) Defendant fails to identify any basis in the record for supposing that the prosecutor was inclined to enter into such a stipulation. Defendant also fails to identify any good cause on which the trial court could base such an order. Finally, defendant fails to show that any prejudice resulted from this alleged deficiency of counsel. These points warrant rejection of defendant's claim. Further, as we have previously noted, defense counsel could have had sound tactical reasons for wanting only one jury: " 'From defendant's perspective, the use of a single jury may help insure that the ultimate decision-maker in capital cases acts with full recognition of the gravity of its responsibility throughout both

phases of the trial and will also guarantee that the penalty phase jury is aware of lingering doubts that may have survived the guilt phase deliberations.' [Citations.]" (*People* v. *Beardslee, supra,* 53 Cal.3d at p. 102.) There is no merit to defendant's claim.

### 2. *Prosecutorial Misconduct Claims*

 Defendant contends the prosecutor also committed misconduct during her closing arguments at the penalty phase. Because defense counsel failed to object or seek an admonishment as to any of these asserted instances of misconduct, defendant has waived the point for appeal unless an admonition would have been useless to cure the harm. (E.g., *People* v. *Jones, supra,* 15 Cal.4th at p. 181.) We briefly review the various items of misconduct and conclude that none of them were so grave that an admonition would not have cured the harm they assertedly caused.

### a. *Consideration of Death of Defendant's Son as Mitigating Factor*

The jury was given an instruction that listed the various statutory aggravating and mitigating factors. (See § 190.3.) The prosecutor told the jury that only three of those factors—(a) (the circumstances of the crime), (b) (defendant's crimes involving force or violence), and (c) (defendant's prior felony convictions)—concerned matters that could be considered aggravating circumstances. The prosecutor told the jury, "[E]verything else in a defendant's life can be considered in mitigation."

Defendant contends the prosecutor's argument improperly "precluded" the jury from considering the death of his son Paul as a mitigating circumstance under section 190.3, factor (a), in determining the penalty. We disagree. Any confusion could have readily been avoided by an objection and admonition. Moreover, the claim is meritless. The court's instructions also told the jury that it could consider, under the "catchall" language of section 190.3, factor (k), any other extenuating circumstance *or sympathetic aspect* in the case. The prosecutor and defense counsel both discussed how sympathy for the defendant, including the loss of his son, could be a proper mitigating consideration under the law. Although the prosecutor argued that in her view the death of defendant's son did not extenuate or mitigate his murders, we doubt the jury was misled by this argument into assuming it could not properly take that fact into account in deciding the penalty.

 We further note that prosecutors properly can argue that evidence offered in mitigation does not genuinely mitigate, that the facts do not warrant sympathy. (*People* v. *Edwards* (1991) 54 Cal.3d 787, 840 [1

Cal.Rptr.2d 696, 819 P.2d 436].) Although the jury is entitled to consider sympathy in deciding the penalty—and it would be improper to suggest otherwise—the jury is not required to feel sympathy for murderers, and counsel may frame their arguments accordingly. (*Ibid.*; see *People* v. *Scott* (1997) 15 Cal.4th 1188, 1222 [65 Cal.Rptr.2d 240, 939 P.2d 354].)

### b. *Consideration of Defendant's Lack of Criminal Record*

 Defendant claims the prosecutor prevented the jury from considering as a mitigating factor his lack of a prior criminal record. Our review of the record indicates the prosecutor simply conceded that section 190.3, factor (c), the defendant's prior felony convictions, was inapplicable as an *aggravating* circumstance.

### c. *Consideration of Defendant's Nonextreme Mental Disturbance*

Defendant asserts the prosecutor misled the jury into believing that defendant's mental condition not amounting to an "extreme mental or emotional disturbance" under section 190.3, factor (d), would not qualify as a mitigating circumstance. The prosecutor argued that defendant was not psychotic nor previously institutionalized, and his mental condition was not "extreme" under factor (d). The prosecutor did not argue that the jury was precluded from considering defendant's mental condition as a mitigating factor under the "catchall" provision, section 190.3, factor (k).

### d. *Consideration of Defendant's Background*

Defendant claims the prosecutor improperly "denigrated" the role of sympathy or mercy toward him by arguing that the jury's reliance on these qualities would be "less than courageous, just, and less than forthright in the exercise of your conscience . . . ." Defendant asserts the prosecutor's argument improperly "prevent[ed]" the jury from considering the death of his son, and similar sympathetic factors, as mitigating circumstances in determining penalty.

As the court told the jury, the prosecutor's argument was simply argument, not evidence. The jury was free to accept or reject that argument. Our review of the record indicates the prosecutor was merely maintaining that the evidence in the case did not justify any strong feelings of sympathy or pity for defendant. The argument was proper. (See, e.g., *People* v. *Edwards*, *supra*, 54 Cal.3d at p. 840.)

### e. *Consideration of Nonstatutory Aggravating Factors*

 Defendant next asserts the prosecutor improperly misled the jury into considering nonstatutory aggravating evidence. (See *People* v. *Boyd*

(1985) 38 Cal.3d 762, 773 [215 Cal.Rptr. 1, 700 P.2d 782].) Defendant bases the claim on points in the prosecutor's closing argument where she (1) asserted that defendant's background, including his friendships and sense of humor, did not justify mitigating the penalty; (2) asked the jury to imagine defendant's threats to Deanna to stay away or she would be killed, and the sounds of her mother's "groans" and "grunting as the struggle goes on"; (3) reminded the jury that none of defendant's witnesses asked that his life be spared; and (4) observed that certain logical witnesses (defendant's brother, father, stepmother, other friends) did not appear to testify on his behalf.

As with his claim of prosecutorial misconduct during the guilt phase, defendant did not object to these supposed instances of misconduct in the penalty phase. Therefore, he has waived this claim as well. (*People* v. *Jones, supra,* 15 Cal.4th at p. 181; *People* v. *Miranda* (1987) 44 Cal.3d 57, 108, fn. 30 [241 Cal.Rptr. 594, 744 P.2d 1127].) Defendant argues that because the misconduct "completely distorted the rules by which the jury should determine the appropriate penalty," an admonition would not have cured the harm. To the contrary, none of the purported misconduct defendant cites was so inherently prejudicial that an admonition could not have cured the harm. (See *People* v. *Medina, supra,* 51 Cal.3d 870, 895; *People* v. *Carrera, supra,* 49 Cal.3d 291, 320.) As previously observed, the court cautioned the jury that counsel's arguments were not evidence and should not be considered as such.

Defendant also argues that his trial counsel was incompetent for failing to object to the asserted misconduct. We reiterate what we stated (*ante,* at pt. II.A.6.c.) with respect to defendant's complaints that his counsel failed to object to asserted prosecutorial misconduct at the guilt phase. The record reveals no reason for counsel's alleged failure, and so the question is cognizable only on habeas corpus; the issue is not properly before us. (*People* v. *Jones, supra,* 15 Cal.4th at p. 182; *People* v. *Carrera, supra,* 49 Cal.3d at p. 320.) We also observe that, in light of the evidence in this case, it is not reasonably probable that the lack of objection to the prosecutor's cited statements affected the penalty verdict. (See *People* v. *Medina, supra,* 51 Cal.3d at p. 895.) Moreover, the cited remarks do not appear to constitute prosecutorial misconduct. Rather, the prosecutor properly argued the import of the circumstances of the crime and commented on mitigating evidence presented and not presented. (*People* v. *Carpenter, supra,* 15 Cal.4th at p. 415; *People* v. *Edwards, supra,* 54 Cal.3d at pp. 839-840.)

We conclude defendant has waived any claim of prosecutorial misconduct during the penalty phase closing arguments.

### 3. *Automatic Modification Motion Claims*

██ Defendant asserts the court erred in failing to conduct a "proper" penalty modification hearing pursuant to section 190.4, subdivision (e). The point is meritless. Following the jury's death penalty verdict, the court continued the matter for 12 days to allow it to review the record. A probation officer prepared a report, which the court reviewed before denying defendant's modification motion. At the hearing, defendant made a personal statement. The court then indicated that, although defendant's murders may have resulted from the death of his son, nevertheless, the jury's verdict was proper, correct, and not contrary to the law or evidence, because both murders were intentional, unjustified, and warranted the death penalty. The court then signed and issued a statement reciting that it had made an "independent determination that the weight of the evidence supported the Jury's findings and verdicts, [and] that the aggravating circumstances outweighed the mitigating circumstances."

Defendant first contends the court failed to make an independent determination as to the appropriate penalty. To the contrary, our review of the record indicates the court exercised its own personal, independent judgment in weighing the case's aggravating and mitigating factors. (See, e.g., *People* v. *Mayfield, supra,* 5 Cal.4th at pp. 195-196.) Defendant relies on *People* v. *Bonillas* (1989) 48 Cal.3d 757, 800-801 [257 Cal.Rptr. 895, 771 P.2d 844], in which we reversed a death penalty judgment because the trial court mistakenly assumed it had no right to annul the jury's verdict if it was supported by the evidence. Nothing in this record indicates the trial court similarly misapprehended its authority to exercise independent judgment on the penalty issue.

Defendant observes that the prosecutor apparently prepared the court's written statement. Defendant claims this too indicates the court failed to exercise independent judgment. We reject the argument. The prevailing parties frequently, and quite properly, assist the court in drafting tentative orders and similar statements. (Cf. Cal. Rules of Court, rule 391.) Moreover, we see nothing improper in drafting such tentative orders in advance of the actual hearing, so long as they accurately reflect the circumstances of the hearing. (See, e.g., *People* v. *Hayes* (1990) 52 Cal.3d 577, 644-645 [276 Cal.Rptr. 874, 802 P.2d 376].)

Defendant next asserts that the court gave insufficient reasons for denying the modification motion. He again cites *Bonillas,* but again the case is inapposite. There, the trial court issued the bare statement that " 'I think the aggravating circumstances were there, that they did exceed the mitigating

circumstances.' " (*People* v. *Bonillas, supra,* 48 Cal.3d at p. 801.) We found the statement "insufficiently specific," failing to indicate which circumstances the court considered or deemed relevant. (*Ibid.*) In the present case, the court identified defendant's principal mitigating circumstances, namely, the death of his son and his previously nonviolent disposition, and found they were outweighed by the aggravating circumstances (intentional, premeditated, unjustified "butchery" of a woman and her fetus). Though brief, this statement was sufficient to identify the relevant circumstances in the case. (See, e.g., *People* v. *Montiel* (1993) 5 Cal.4th 877, 946 [21 Cal.Rptr.2d 705, 855 P.2d 1277].) The trial court's omission of other possible mitigating factors from its comments, such as defendant's lack of a prior criminal record, did not render its statement of reasons defective. (See, e.g., *People* v. *Sanchez* (1995) 12 Cal.4th 1, 83 [47 Cal.Rptr.2d 843, 906 P.2d 1129]; *People* v. *Montiel, supra,* 5 Cal.4th at p. 946.)

Defendant next argues the trial court erred by considering the contents of the probation report before denying the modification motion. Defendant observes that the report contained matters not presented to the jury, including statements by Deanna regarding defendant's conduct, and by Doreen's mother regarding defendant's knowledge of her daughter's pregnancy. Additionally, the probation report contained some "victim impact" statements from Doreen's parents seeking the death penalty for defendant. The report also included the probation officer's assessment of the various aggravating and mitigating factors in the case and her opinion that the death penalty was appropriate.

Neither the trial court's discussion of the modification motion nor its ultimate statement denying the motion indicates the court *relied* on any portion of the probation report in denying modification. This fact distinguishes the case from *People* v. *Lewis* (1990) 50 Cal.3d 262, 287 [266 Cal.Rptr. 834, 786 P.2d 892], which defendant cites. (See *People* v. *Medina* (1995) 11 Cal.4th 694, 784 [47 Cal.Rptr.2d 165, 906 P.2d 2], and cases cited.) Moreover, the record fails to show that defendant objected to the court's consideration of the probation report. Accordingly, defendant waived the point on appeal. (*Ibid.*)

Next, defendant suggests the trial judge was "prejudiced" because of a claimed preconception that a life sentence would not mean defendant would be in prison for the rest of his life. To the contrary, the record reflects only an extraneous discussion with counsel, out of the presence of the jury, regarding the last murder case the judge prosecuted before being elected to the municipal court. In that case, the defendant apparently was paroled, contrary to prior understandings with the Department of Corrections. The

circumstances the trial judge recounted from his previous career had no bearing on defendant's case. Nor did the trial court's comments reflect any misgivings about the import of a sentence of life without possibility of parole. In any event, defendant failed to raise any objection at trial and has accordingly waived the issue for appeal.

### 4. *Constitutionality of the Death Penalty Sentencing Scheme*

Finally, defendant contends that California's death penalty law is unconstitutional in various respects, including failure (1) to identify aggravating and mitigating factors or to delete irrelevant factors, (2) to require written findings, (3) to instruct on burden of proof, (4) to require intercase and intracase proportionality review, (5) to define statutory provisions regarding consideration of mitigating evidence, (6) to narrow the special circumstances available for imposing death, (7) to confine prosecutorial discretion to seek the death penalty, (8) to instruct the jury regarding the unavailability of parole for persons serving life sentence without possibility of parole, and (9) to instruct that a life without parole sentence must be imposed if the jury determines that the mitigating circumstances outweigh the aggravating ones.

Defendant acknowledges that we have rejected these constitutional challenges in prior cases. He offers no good reasons why we should reconsider them at this time.

### III. CONCLUSION

The judgment is affirmed.

George, C. J., Mosk, J., Kennard, J., Baxter, J., Werdegar, J., and Brown, J., concurred.

Appellant's petition for a rehearing was denied April 15, 1998.